J-S23015-15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: S.L.K., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: H.C., FATHER | : | No. 3245 EDA 2014 |

Appeal from the Decree October 9, 2014,
Court of Common Pleas, Philadelphia County,
Family Court at No(s): CP-51-AP-0000157-2013
and CP-51-DP-0001047-2011

BEFORE: DONOHUE, SHOGAN and STRASSBURGER*, JJ.

MEMORANDUM BY DONOHUE, J.:                    **FILED MAY 06, 2015**

H.C. ("Father") appeals from the October 9, 2014 decree entered by

the Philadelphia County Court of Common Pleas terminating his parental

rights to S.L.K. ("Child"), a female born in August 2003, pursuant to 23

Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b),[1] and changing Child's

permanency goal to adoption. Upon review, we affirm.[2]

The Philadelphia Department of Human Services ("DHS") became

involved with this family upon receiving a substantiated report that Father

---

[1] In the decree, the trial court erroneously indicates that it terminated Father's parental rights pursuant to subsection (a)(6) instead of (a)(5). We conclude that this was a scrivener's error, as DHS raised subsection (a)(5), not (a)(6), in its petition to involuntarily terminate Father's parental rights to Child, and there was no mention of subsection (a)(6) at the termination hearing. *See* Petition for Involuntary Termination of Parental Rights, 3/15/13, ¶ 6. Furthermore, subsection (a)(6) only applies "[i]n the case of a newborn child[.]" 23 Pa.C.S.A. § 2511(a)(6). Child was eleven years old at the time of the termination hearing, rendering this subsection inapplicable. Furthermore, Father does not raise this as error on appeal.

[2] K.C.K. ("Mother") passed away prior to the October 9, 2014 hearing.

*Retired Senior Judge assigned to the Superior Court.

physically abused Child and that Child was afraid to return home. N.T., 10/9/14, at 15. DHS filed a petition for dependency, and the juvenile court adjudicated Child dependent on June 9, 2011. *Id.* On March 15, 2013 and March 20, 2013, respectively, DHS filed petitions to involuntarily terminate Father's parental rights and change the permanency goal for Child to adoption. After several continuances, the trial court held a hearing on both petitions on October 9, 2014.

At the inception of the hearing, Father's counsel requested to withdraw, as Father wished to retain private counsel to represent him at the hearing. *Id.* at 6-7. Both DHS and the child advocate objected to the continuance. The trial court denied Father's request for a continuance based upon Father's "opportunity on numerous occasions in the past to secure private counsel or raise the issue in a timely manner so that the appropriate administration of justice would not be delayed." *Id.* at 12.

At the goal change/termination hearing, DHS presented the testimony of Roya Paller ("Paller"), the worker from DHS assigned to Child's case; Jessica Redmond ("Redmond"), the supervisor at Jewish Family and Children Services (the agency overseeing Child's foster home placement) who supervised visits between Child and Father; Zaikeya Snead ("Snead"), the foster care case worker from Jewish Family and Children Services; and Kelly Casper ("Casper"), Child's therapist from Children's Crisis Treatment Center ("CCTC"). Paller testified that at the inception of the case, Father's family

service plan ("FSP") goals included completing a parenting capacity evaluation; completing anger management; completing domestic violence therapy through Menergy; maintaining contact with DHS; and attending supervised visits with Child. *Id.* at 15-16. Additionally, the juvenile court ordered him to participate in mental health counseling and to participate in Child's trauma therapy[3] through CCTC by attending psychoeducational therapy.[4] *Id.* at 25, 27. According to Paller, other than anger management, which Father completed in 2011, Father had not provided any documentation to indicate that he completed any of his FSP goals or participated in the services ordered by the court. *See id.* at 16-19, 25-29. Indeed, on April 5, 2012, the trial court suspended Father's visitation with

_____

[3] Child was diagnosed with post-traumatic stress disorder ("PTSD"). N.T., 10/9/14, at 83.

[4] Throughout the notes of testimony, the court reporter erroneously transcribed testimony concerning psychoeducational therapy as "cycle educational therapy." *See, e.g.,* N.T., 10/9/14, at 26. A review of the pertinent court orders reveals that Father was ordered to participate in psychoeducational therapy. *See, e.g.,* Trial Court Order, 4/5/12.

According to Casper, the purpose of having parents and caregivers engage in psychoeducational therapy is

> at first [] to help them understand about the impact of trauma on children[,] with the goal eventually [of] getting to the point of talking with them if they were involved in the child's trauma history about their role, acknowledging their role, and how they can support their child in the time of recovery.

N.T., 10/9/14, at 85.

Child until he completed psychoeducational therapy and the Menergy program. *Id.* at 26. Furthermore, despite Father's completion of anger management therapy, Paller and Casper testified that Father continued to be "aggressive" during interactions with them and, on at least one occasion, with Child. *Id.* at 23-24, 86. Paller, Redmond and Casper agreed that terminating Father's parental rights would best serve Child's needs and welfare. *Id.* at 20-21, 48-49, 87, 90-91.

Father testified on his own behalf. He admitted physically abusing Child, but stated that he believed it was "discipline[]." *Id.* at 101, 113. He further testified that he completed every FSP goal and court-ordered program that he could, but did not have documentation because he gave it to a prior attorney and the attorney never returned it or provided it to DHS or to the trial court. *Id.* at 102, 106-07, 112, 116.

At the conclusion of the hearing, the trial court found that DHS had satisfied its burden of proof. It found Father's testimony was not credible and that the testimony provided by DHS' witnesses was credible. *Id.* at 121-23. The trial court entered a decree terminating Father's parental rights to Child pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b).

Father requested counsel to represent him on appeal, and the trial court appointed counsel. He filed a timely notice of appeal along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P.

1925(a)(2)(i). The trial court issued a responsive opinion pursuant to Pa.R.A.P. 1925(a)(2)(ii).

Father raises the following issues for our review:

1. Did the trial court err by relying on facts that were not introduced into evidence?

2. Did the juvenile court err in determining that it was in the best interest of [C]hild to terminate Father's parental rights as Father had been moving towards completing his FSP goals?

Father's Brief at 4.[5, 6]

_____

[5] On March 31, 2015, this Court received a motion filed by Father requesting to amend his appellate brief to include a fact "inadvertently omitted" from Father's statement of the case in his appellate brief, but included in the argument section of his brief. Petition/Motion to Amend Brief, 3/31/15, ¶ 3. Specifically, Father sought to add the following to his statement of the case:

> Document 24 in the lower court record contains a certificate for [Father] regarding his completion of [twenty-two] hours of parenting instruction on September 19, 2011. Document 24 also includes contains [sic] a certificate of achievement for successful completion of anger management on September 10, 2011. These documents showed how [F]ather had been working toward completion of the FSP goals that were set by DHS.
>
> Despite these documents[,] the [c]ourt granted both DHS Petitions' to Terminate Parental Rights and Change the Goal to Adoption [sic].

Father's Brief at 7. Neither DHS nor the child advocate filed an objection to this request. We therefore grant Father's motion and consider his brief as amended, which he filed concomitantly with his motion to amend, as his only filing.

Beginning with the first issue Father raises on appeal, he asserts that the trial court improperly relied upon evidence not introduced at the October 9, 2014 hearing in rendering its decision. Father's Brief at 9-14. Father states that the trial court relied solely upon the facts contained in DHS' petition to involuntarily terminate Father's parental rights when fashioning its findings of fact, in support of some of which DHS presented no evidence at the October 9 hearing. According to Father, this means "that the trial court failed to base [its] decision on evidence that was presented but relied on an exhibit of facts that [DHS] intended to show at the hearing." Father's

---

[6] The child advocate representing Child asserts that the appeal should be quashed based upon Father's failure to comply with Rules 2117 and 2119 of the Pennsylvania Rules of Appellate Procedure. *See* Child's Brief at 18-19; *see also* Pa.R.A.P. 2117(a) (stating the contents of the statement of the case), (c) (requiring information regarding how the appellant preserved the issue(s) for appeal), 2119(c) (requiring citations to the record in the argument). The child advocate asserts that Father "fail[ed] to provide a statement of the facts necessary for a substantive review and [] fail[ed] to cite to the record in either his [s]tatement of the [c]ase or [a]rgument," resulting in his "fail[ure] to show that he preserved any issues for review by the appellate court." *Id.* at 19.

Our review of Father's brief reveals that it suffers from the deficiencies alleged by the child advocate. Rule 2101 permits this Court to quash or dismiss an appeal if an appellant materially fails to abide by our rules of appellate procedure. Pa.R.A.P. 2101. In the interest of justice, however, we decline to do so in this case. *See Booth v. McDonnell Douglas Truck Servs., Inc.*, 585 A.2d 24, 25 (Pa. Super. 1991) ("This Court does not condone violations of its procedural rules. Nonetheless, in the interests of justice we will not quash this appeal pursuant to Pa.R.A.P. 2101, as is our prerogative under Pa.R.A.P. 105.").

Brief at 14.[7]  Father contends that these facts could have affected the trial court's decision and its credibility determinations, requiring remand for a new proceeding before a different judge.  *Id.* at 14.

Our review of the trial court's 1925(a) opinion reveals that Father is correct that the trial court cites exclusively to DHS' petition to involuntarily terminate Father's parental rights in its findings of fact.  *See* Trial Court Opinion, 12/10/14, at 2-11.  Father is also correct that some of those facts find no evidentiary support in the notes of testimony of the October 9, 2014 goal change and termination proceeding.  It is unclear why the trial court chose to summarize its facts from DHS' petition to involuntarily terminate Father's parental rights and we do not condone this practice.  Nonetheless, his argument does not warrant relief.  In its legal analysis explaining the reasoning for its decision, the trial court cites to the notes of testimony from the October 9 proceeding, thus relying on evidence of record in support of its decision.  *See id.* at 13-15.

Furthermore, the trial court announced its credibility determinations on the record at the end of the hearing, basing its conclusions on the testimony it heard at the hearing and finding as follows:

---

[7]  We find this argument ironic, as on appeal, Father seeks for this Court to entertain evidence not introduced at the October 9 hearing.  Specifically, documentation concerning his completion of twenty-two hours of parenting classes and his completion of anger management were not introduced into evidence, but are referenced in both the statement of the case and argument sections of his appellate brief.  *See* Father's Brief at 7, 16.

First, as a matter of findings, first thing, is [F]ather is not credible. Father has a highly manipulative personality. And[] he attempts to manipulate the factual situation so that it is never his fault. And he has never done anything wrong. And he blames the agencies. He blames the workers. He fails to take personal responsibility for any of his actions.

That suggests to me that what I am hearing is not credible. It's manipulated such that he tries to twist all of the events that have occurred in [C]hild's life. He fails to take responsibility for his own actions and blames everyone else.

To [DHS] workers, the therapist, they were as informed about the events of this case and the events of the handling of [C]hild as any of the [DHS] workers that I have had testified [sic] in front of me. They had a grasp of detail. They were able to answer all of the questions and had to be [sic] a highly organized understanding of the development of [C]hild throughout her placement. I find their testimony to be significantly more credible than [F]ather's testimony.

N.T., 10/9/14, at 121-22.

The trial court's credibility determinations are supported by the testimony of record. Paller provided testimony regarding Father's FSP goals and the basis for requiring the fulfillment of each of the goals. *Id.* at 15-19. She testified that Father has completed few of the goals, providing documentation only of his completion of anger management counseling, despite repeated reminders from both DHS and the trial court. *Id.* at 23-28. Father, on the other hand, claimed to have completed all of the required FSP

goals, and blamed his attorney for not providing the necessary documentation to DHS. *Id.* at 108, 110, 111.

Although Father claimed to have completed his FSP goals and was fully compliant with the trial court's orders, when asked pointed questions about goals that he had not yet satisfied, he provided excuses for each goal's non-completion. Father faulted DHS for his failure to attend a parenting evaluation, stating that Paller never called to set it up for him. *Id.* at 111-12. Paller testified, however, that she made the necessary referral twice and that Father failed to follow through both times. *Id.* at 17.

Father further testified that DHS did not provide him with the contact information for Child's current therapist at CCTC, only giving him contact information for a former therapist there, and so he could not contact the proper person to arrange for psychoeducational therapy. *Id.* at 118. Paller testified that she provided Father with the necessary contact information on several occasions, including once "[a]t the bar of the court." *Id.* at 29. Father did not contact CCTC to set up psychoeducational therapy until June of 2014. *Id.* at 85. Casper arranged two meetings with Father to which he arrived forty-five minutes late. *Id.* Because DHS had already filed the petition to terminate his parental rights to Child, Casper did not initiate psychoeducational therapy with Father, and only met with Father to obtain information about Child's history to aid in her treatment for PTSD. *Id.*; *see* n.4.

According to Father, documents got lost in the mail; DHS' clerical staff was at fault; everyone else was to blame but Father for his failure to complete his FSP goals, *id.* at 119, and the trial court found this testimony was not worthy of belief. "The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citation and quotation marks omitted). As the record supports the trial court's credibility determinations, no relief is due.

As his second issue raised on appeal, Father asserts that the record does not support the trial court's decision to terminate his parental rights to Child. Father's Brief at 14-17. Father only addresses the sufficiency of the evidence to terminate his rights pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (2); he presents no argument regarding the propriety of the decision to terminate his rights pursuant to subsections (a)(5), (8) and (b). *See id.*; *see also* Decree of Involuntary Termination of Parental Rights, 10/9/14. We could affirm the trial court's decision on that basis alone, but for purposes of completeness, we will assess the sufficiency of the evidence to support the trial court's decree.

We review a decree terminating a parent's rights for an abuse of discretion or error of law. *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). As stated above, we must accept the credibility determinations and

- 10 -

factual findings of the trial court that are supported by the record. ***Id.*** This Court may not reverse a termination decree simply because we would have reached a different result based on the same facts. ***Id.***

Under section 2511 of the Adoption Act, the trial court must engage in a bifurcated process. First, the trial court must examine the parent's conduct under 2511(a). ***In re Adoption of R.J.S.***, 901 A.2d 502, 508 (Pa. Super. 2006). The burden of proof is on the petitioner to establish by clear and convincing evidence the existence of grounds for termination under section 2511(a). ***In re J.L.C. and J.R.C.***, 837 A.2d 1247, 1251 (Pa. Super. 2003). If termination is found by the trial court to be warranted under section 2511(a), it must then turn to section 2511(b), and determine if termination of the parent's rights serves the children's needs and welfare. ***In re K.M.***, 53 A.3d 781, 791 (Pa. Super. 2012).

This Court need only agree with the trial court's decision as to any one subsection of section 2511(a) in order to affirm the termination. ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). We will therefore examine the facts under section 2511(a)(8), which states:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>            \*     \*     \*
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary

agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(8). We will address each of the three elements seriatim.

Beginning with the first element, the record clearly reflects that Child was out of Father's care for a period in excess of twelve months. DHS removed Child from Father's care on May 27, 2011, and DHS filed the termination petition on March 15, 2013. *See* N.T., 10/9/14, at 13, 15. Thus, the first requirement is met.

Turning to the second element, we recognize that "termination under subsection (a)(8) 'does **not** require an evaluation of [a parent's] willingness or ability to remedy the conditions that led to placement of [the] child[].'" *In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009) (quoting *In re Adoption of R.J.S.*, 901 A.2d at 511)) (emphasis in the original). The relevant questions under the second prong are whether the parent has remedied the conditions that led to the removal of the child, whether those efforts were first initiated prior to filing the petition to terminate the parent's rights, and whether the child's reunification with that parent is imminent at the time of the termination hearing. *See* 23 Pa.C.S.A. § 2511(b); *In re I.J.*, 972 A.2d at 11; *see, e.g.*, *In re Adoption of R.J.S.*, 901 A.2d at 512 (termination

under (a)(8) was appropriate where Mother was not in a position to parent her children at the time of the termination hearing).

The record reflects that Child was removed from Father's care following a substantiated report to DHS that he had physically abused Child and that Child was afraid to return to his care. N.T., 10/9/14, at 15. At the time of the termination hearing, Father had not remedied the circumstances that brought Child into DHS' care. He failed to attend his parenting evaluation (*id.* at 17); he failed to provide documentation of his attendance in domestic violence counseling (*id.* at 18); he failed to participate in mental health treatment (*id.* at 19); and he failed to participate in psychoeducational therapy, which would have helped him to understand his role in Child's trauma and how to help her in her recovery (*id.* at 84-85).

Although Father attended anger management counseling, he continued to be "aggressive" with service providers. *Id.* at 23-24, 86. Child even reported that Father was physically aggressive with her during a visit. Redmond testified that during a visit, Father reprimanded Child about something concerning school. At the conclusion of the visit, Redmond believed that he was hugging Child, but Child subsequently reported that Father was "poking" Child in her side, causing Child to cry. *Id.* at 42. Child told Redmond that she was scared of Father and came up with a "plan" that if she felt scared in the future, she would tell Redmond that she needed to

be excused to the restroom so that Redmond would know she was afraid. *Id.*

Based on the testimony presented, Father not only failed to remedy the circumstances that led to Child's removal, but he failed, in large part, ever to address these issues. As such, the second element of subsection (a)(8) was satisfied.

Turning to the third requirement for termination under subsection (a)(8), the record supports a finding that terminating Father's parental rights would best serve Child's needs and welfare. Although Father was permitted supervised visits with Child upon completion of the Menergy program and psychoeducational therapy, both of which he failed to do, Father nonetheless arranged for Child to meet him without the trial court's permission or the knowledge of DHS, one time transporting her to his home in Reading and then refused to drive her back to Philadelphia because "he had no gas." *Id.* at 70-71, 72-73. Furthermore, Father's inappropriate and unsanctioned contacts with Child resulted in her being moved from a foster home where she had been doing well to a new placement, the location of which was not disclosed to Father. *Id.* at 74-75. According to Snead, Father would sit outside of the foster home waiting for Child – "[i]t was not safe for her[;] [h]e would take her[,] [a]nd [Child] knew that he would." *Id.* at 74.

Child was diagnosed with PTSD, and according to Cooper, Child "needs to be with [a] caregiver that can be supportive of her." *Id.* at 87. Child was

"angr[y]" and "hostile" after interacting with Father, acting out at her foster home and at school following visits – the scheduled visits as well as the unsanctioned visits. *Id.* at 45, 71, 87. Cooper testified that it was not in Child's best interest to have a relationship with Father at that time, as Father did not respect the guidelines for contact with Child that have been put in place. *Id.*

Moreover, because of Father's failure to complete many of his FSP goals, neither the trial court nor DHS had any information about his capacity to parent Child, which was especially troubling because of the history of abuse and Child's PTSD diagnosis. *Id.* at 19. Testimony reflected continued safety concerns about Child being in Father's care which, as of the time of the termination hearing, Father had failed to address. As such, the third element under subsection (a)(8) is met.

Having concluded that the record supports the trial court's finding of clear and convincing evidence to terminate Father's parental rights to Child pursuant to section 2511(a)(8), we now turn to subsection (b), which states:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S.A. § 2511(b).

Under section 2511(b), we inquire whether termination of parental rights would best serve the developmental, physical and emotional needs and welfare of the child. *In Re C.M.S.*, 884 A.2d 1284, 1286-87 (Pa. Super. 2005). "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *Id.* at 1287 (citation omitted). The trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.* The mere presence of a bond does not preclude termination, as "even the most abused of children will often harbor some positive emotion towards the abusive parent." *In re T.S.M.*, 71 A.3d at 267 (quoting *In re K.K.R.-S.,* 958 A.2d 529, 535 (Pa. Super. 2008)). "The continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the children cannot be misconstrued as bonding." *Id.* "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *Id.* at 268 (citation omitted).

The trial court found, based on the testimony by DHS' witnesses, "there was not a strong bond between Father and [C]hild," and thus, "terminating Father's parental rights would not cause [C]hild irreparable

harm and would be in [her] best interest[.]" Trial Court Opinion, 12/10/14, at 14. We agree.

The record reflects that Paller testified that Child "is in a safe and loving environment." N.T., 10/9/14, at 20. Although Child needs to continue to work through her traumatic past, her foster parents "will be able to meet her needs," and "will be able to create a safe environment for [Child]." *Id.* According to Paller, Child "right now, is in the safest place that she can be." *Id.* In contrast, Paller described the bond between Father and Child as "very toxic," based upon her observations of Father negatively affecting Child's stability. *Id.* at 21.

Redmond likewise testified that she believed terminating Father's parental rights was in Child's best interest. *Id.* at 48. Like Paller, she testified that she observed no beneficial bond between Father and Child. *Id.*

Lastly, as stated above, Cooper testified that a continued relationship with Father was not in Child's best interest at that time. *Id.* at 87. She further testified that Child has disclosed that she wants to be adopted by her current foster parents and only wanted to have some contact with Father. *Id.* at 91-92.

The trial court found the above testimony credible, and, as stated supra, the record supports the trial court's credibility determinations. The evidence presented supports a finding that terminating Father's parental rights would best serve Child's needs and welfare under section 2511(b). As

such, the trial court did not err by terminating Father's parental rights to Child.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/6/2015