**In the Interest of K.M., A Minor.**

**Appeal of: Y.S., Natural Mother, Appellant.**

Superior Court of Pennsylvania.

Submitted May 14, 2012.

Filed Aug. 6, 2012.

Jami T.A. Brown, Wilkes Barre, for appellant.

John A. Belino, Kingston, Guardian Ad Litem, for appellee.

Nicole F. Bednarek, Wilkes Barre, for Luzerne County, appellee.

BEFORE: BOWES, ALLEN, and MUNDY, JJ.

OPINION BY BOWES, J.:

Y.S. ("Mother") appeals from the December 21, 2011 order wherein the orphans' court terminated her parental rights to her minor son K.M. pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(8) and (b).[1] We affirm.

The orphans' court summarized the pertinent facts as follows:

K.M., the minor child, was born [during] June ... 2009. K.M. is currently three years old. This appeal involves the proposed termination of Mother's parental rights. [A] hearing was first held on May 12, 2011, specifically with respect to Father's termination of parental rights. Also, at the hearing, Mother was appointed counsel by the Court. The Guardian Ad Litem, for the child, John Bellino, was also present for said hearing. Additional hearings were held and testimony and other evidence [was] presented and received by the Court concerning Mother's termination of parental rights on August 2, 2011[,] ... reconvened on November 2, 2011, and concluded on December 15, 2011. At the conclusion of the December 15th proceeding, this Court issued decrees

---

1. The orphans' court also entered an order terminating the parental rights of K.M.'s father, who did not appeal.

terminating the parental rights of both natural Father and natural Mother.

It is unrebutted that the minor child has been in placement and therefore removed from the care of Father and Mother, since the child's birth. The minor child was born with drugs in his system. The natural mother tested positive for marijuana at the time of the child's birth. The minor child was placed in the Intensive Care Unit (ICU) at Communtiy [sic] Medical Center in Scranton, PA, and remained at the hospital for one and one half months. On August 6, 2009, the minor child was placed with the foster parents upon being discharged from the hospital. Once the minor child was placed with the foster parents, the minor child was required to stay indoors at their home until October 20[1]0 due to the fact that the minor child was born with tiny and underdeveloped lungs with severe breathing issues. The minor child was required to be on a nebulizer several times per day to assist him with his breathing problems. N.T. at 30–32, 08/02/11.

Since August 6, 2009 until the present, K.M. was in continuous placement with [L.K. and K.K. ("Foster Parents")]. Reasons for placement was [sic] that the natural mother tested positive for cannabinoids at the time of the child's birth. The natural mother also had parenting deficits, unstable housing, and mental health issues. N.T. at 14, 8/2/2011. The natural father did not have any contact with the minor child since the child's placement.

Trial Court Opinion, 2/13/12, at 2–3.

Following K.M.'s placement in the care of Luzerne County Children and Youth Services ("CYS"), the juvenile court ordered the then-seventeen-year-old Mother to complete parenting classes, drug and alcohol treatment, mental health services, and maintain safe and stable housing. N.T., 8/2/11, at 33. The court also ordered urine screens to ensure Mother's compliance. *Id.* Mother initially complied with the court-ordered directives; however, when CYS attempted to extend Mother's visitations with K.M. during summer 2010 from supervised visitation to weekend visitation, Mother failed to abide by the rules CYS established to ensure K.M.'s safety. *Id.* at 34–50, 79. Specifically, following the first and only weekend visitation, Mother flouted CYS's rules regarding K.M.'s return to the agency following the visitation—she hurriedly returned the child with a soiled diaper and without ensuring that K.M. had his medical supplies. *Id.* at 42–43.

In addition, Mother neglected her son's medical conditions during the weekend visitation, lied to CYS about her availability to discuss the visitation, and concealed two troubling episodes that occurred while K.M. was in her care during July 9–12, 2010. *Id.* at 43–47. For example, Mother attempted to hide from CYS that an assailant shot at her male companion, whom she refused to identify, shortly after she and K.M. had left his company. *Id.* at 50–51. Mother also attempted to obscure a related incident wherein an assailant broke the window of her CYS-approved residence during the weekend visitation. *Id.* Rather than advising CYS immediately of either incident, Mother went to her mother's home, which was not approved by the agency, for the remainder of the weekend visitation and hurriedly returned K.M. to CYS under the pretense of having to rush off for a job interview, so that she could avoid discussing the situation with CYS. *Id.* at 51.

During the subsequent investigation into the shooting, the police discovered multiple bundles of heroin inside a bedroom drawer

in Mother's residence and charged Mother with possession of a controlled substance. *Id.* at 54, 190. The police also discovered Father's photo identification, men's clothing, and bullets matching the caliber of a shell casing recovered from the shooting. *Id.* at 190–191. Father's identification was discovered in Mother's home along with men's clothing, although Mother had previously advised CYS that she ceased contact with Father and did not know his whereabouts. *Id.* at 52, 81–82. While the police identified Father as the assailant who shot at Mother's companion, and the would-be victim gave police a description of the gunman that matched Father's physical characteristics, Mother refused to cooperate with the police investigation. *Id.* at 190–192. Based on the July 2010 episodes, Mother's continued attempts to deceive the agency, and her utter disregard for K.M.'s safety, CYS obtained an August 2010 court order that permitted it to suspend all visitations with Mother for safety reasons. *Id.* at 81–82, 122. Although Mother could have petitioned the juvenile court for a hearing to reinstitute visitation, Mother has not had any contact with her son since July 2010. *Id.* at 55–56.

On March 25, 2011, CYS filed a petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8) and (b). Counsel was appointed and, following three non-consecutive days of testimony, the orphans' court entered the above-referenced order terminating Mother's parental rights to K.M. pursuant to § 2511(a)(8) and (b). This timely appeal followed. Mother complied with Pa.R.A.P. 1925(a)(2)(i) by filing a statement of errors complained of on appeal concurrent with her notice of appeal.

Mother raises the following issues on appeal:

I. Whether the trial court erred in denying [Mother's motion] for appointment of legal counsel for the minor child in the contested termination proceeding thereby denying counsel for the child. Further whether the trial court erred in the manner in which a guardian ad litem was appointed for the minor child.

II. Whether the trial court erred in finding that [CYS] proved the elements of termination with respect to 23 Pa. C.S.A. [§ ] 2511(a)(8) and 2511(b), through clear and convincing evidence.

III. Whether the trial court erred in finding there was sufficient evidence presented at trial to establish that the conditions which led to the removal or placement of the child continue to exist and that termination of parental rights would best serve the needs and welfare of the child.

IV. Whether the trial court failed to consider Luzerne County [CYS's] failure to make good faith efforts to promote reunification of [Mother and K.M.] and its affirmative actions to prevent same.

Mother's brief at i-ii.

 We review an order terminating parental rights in accordance with the following standard:

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa.Super.2009) (*quoting In re S.H.*, 879 A.2d 802, 805 (Pa.Super.2005)). The burden is upon the petitioner to prove by clear and convincing evidence that its asserted grounds for seeking the termination of parental rights are valid. *Id.* Moreover, we have explained that:

> [t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (*quoting In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa.Super.2003)). The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73–74 (Pa.Super.2004). If competent evidence supports the trial court's findings, we will affirm even if the record could also support an opposite result. *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa.Super.2003). This Court may affirm the trial court's termination of parental rights with regard to any one subsection of section § 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super.2004) (en banc).

■ Mother's first issue challenges the orphans' court's decision to deny her motion to appoint counsel on K.M.'s behalf during the contested termination proceedings pursuant to 23 Pa.C.S. § 2313(a). The following facts are relevant to our review. At the outset of the August 2011 evidentiary hearing, Mother made an oral motion for the appointment of legal counsel to represent K.M.'s legal interests during the termination proceedings. N.T., 8/2/11, at 6. After the orphans' court indicated that an attorney, John A. Bellino, Esquire, had been appointed as K.M.'s guardian *ad litem* during the dependency proceedings, served as guardian *ad litem* during the orphans' court's prior termination hearings concerning Father, and continued to serve in that capacity, Mother posited that the plain language of § 2313 mandated the appointment of counsel in the case at bar even though an attorney already represented her son as guardian *ad litem*.[2] *Id.* at 6–8. Mother reasoned that while the guardian *ad litem* is charged with representing K.M.'s best interest, counsel must be appointed in order to represent the child's legal interest. *Id.* at 7. The orphans' court rejected Mother's argument, concluding, "it's not necessary to appoint both a guardian *ad litem*, who is an attorney, and also have an attorney appointed." *Id.* at 8.

As noted, the crux of Mother's position is that the appointment of counsel is mandatory pursuant to § 2313(a) and that "a Guardian ad Litem cannot play a dual role acting both as legal representation for the child and as guardian ad litem[.]" Appellant's brief at 21–22. Mother argues that innate differences exist between the two roles that preclude one attorney from serving a child in both capacities. *Id.* For the following reasons, we reject Mother's argument that the appointed guardian *ad litem*, Attorney Bellino, cannot also serve as K.M.'s legal counsel.

---

2. We reject Mother's concomitant challenge to the manner in which the orphans' court appointed Attorney Bellino to serve as K.M.'s guardian *ad litem*. Simply stated, Mother complains that Attorney Bellino was not formally appointed to serve as guardian *ad litem* until after Mother's initial orphans' court hearing on August 2, 2011. However, regardless of the date Attorney Bellino's appointment was memorialized on the docket, it is beyond argument that Attorney Bellino served as K.M.'s guardian *ad litem* since May 12, 2011. Moreover, Mother cannot legitimately assert prejudice based upon the court's delay in formalizing Attorney Bellino's appointment. Thus, no relief is due.

The pertinent statutory provision provides as follows:

**(a) Child.**—The court shall appoint counsel to represent the child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents. The court may appoint counsel or a guardian ad litem to represent any child who has not reached the age of 18 years and is subject to any other proceeding under this part whenever it is in the best interests of the child. No attorney or law firm shall represent both the child and the adopting parents.

23 Pa.C.S. § 2313(a). The purpose of § 2313(a) "is to protect the interests of the child. Implicit in this appointment of counsel is a recognition that the interests of the child may be very different than or diverge from the interests of the other parties to the proceedings." *In re Adoption of J.L.*, 769 A.2d 1182, 1185 (Pa.Super.2001).

We must interpret § 2313(a) to resolve Mother's complaint. As statutory interpretation implicates a question of law, our scope of review is plenary and our standard of review is *de novo*. *D.R.C. v. J.A.Z.*, 612 Pa. 519, 31 A.3d 677, 681 (2011); *Sayler v. Skutches*, 40 A.3d 135, 139 (Pa.Super.2012). In *In re D.S.*, ——— Pa. ———, 39 A.3d 968 (2012), our Supreme Court recently outlined the proper inquiry as follows:

When interpreting the language of a statute, we are guided by the polestar principle that we must ascertain and effectuate the intent of the General Assembly in enacting the statute. *See* 1 Pa.C.S.A. § 1921(a). We are further guided by the Statutory Construction Act's command that "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursu-

ing its spirit." 1 Pa.C.S.A. § 1921(b). Generally, the best indication of the General Assembly's intent in enacting a statute may be found in its plain language. *Martin v. Commonwealth, Dep't of Transp., Bureau of Driver Licensing*, 588 Pa. 429, 438, 905 A.2d 438, 443 (2006).

Although § 2313(a) mandates that the orphans' court appoints counsel in all cases where involuntary termination of parental rights is contested, the plain language of § 2313(a) is not clear and free from ambiguity when applied to a scenario where, as here, the orphans' court appointed an attorney to serve as the child's guardian *ad litem*. The complexity is highlighted by the provision's first two sentences. While the first sentence of § 2313(a) directs that counsel shall be appointed in all cases where involuntary termination is contested, the second sentence addresses a situation where a trial court has discretion to appoint counsel **or** a guardian *ad litem*. While the case at bar does not fall within the latter scenario, the legislature's use of a disjunctive conjunction in the provision illustrates its recognition that in most cases it would be superfluous to appoint both counsel and an attorney serving as guardian *ad litem*. The official comment explaining the prospective application of § 2313 further illuminates the legislature's perspective.

This new provision requires the court to appoint counsel for a child when parental rights are being involuntarily terminated and, when necessary, to appoint a guardian ad litem for a child who has not reached the age of 18 years. **The guardian ad litem concept is broad enough to allow the appointment of a person other than a lawyer.** For example, a social worker could be appointed guardian ad litem within this provision; **in an appropri-**

ate case a nonlawyer guardian ad litem could request appointment of counsel.

23 Pa.C.S. § 2313, Joint State Government Committee Comment—1970 (emphases added). Thus, reading § 2313 in *pari materia* with the official comment, it is not clear and free from all ambiguity that the legislature intended to require the superfluous appointment of counsel under the scenario where, as here, an attorney is serving as guardian *ad litem.* Tellingly, while the legislature's comment identified a situation where a non-lawyer guardian *ad litem* could request that counsel be appointed to represent a child's legal interest, there is no reciprocal requirement, either expressed in § 2313 or suggested by the official comment, that precludes an attorney serving as guardian *ad litem* from also serving as legal counsel.[3]

In addition, the case law that Mother cites in an attempt to bolster her position is unconvincing. Neither our Supreme Court nor this Court has addressed the precise issue raised in this appeal in a published writing, and the cases that Mother invokes in support of her proposed application of § 2313(a) fail to indicate whether the trial court had previously appointed an attorney to serve as guardian *ad litem.* See *In re Adoption of N.A.G.,* 324 Pa.Super. 345, 471 A.2d 871 (1984) (realizing error after the fact, trial court appointed counsel, directed counsel to review record, interview children and conduct investigation); *In re E.F.H.,* 751 A.2d 1186 (Pa.Super.2000) (trial court did not appoint counsel as required); *see also In re M.T.,* 414 Pa.Super. 372, 607 A.2d 271 (1992); *In re Adoption of J.L., supra* (noting court-appointed counsel). Hence, although the cases stand for the well-established principle that § 2313 is mandatory, none of the cases identifies whether the trial court had previously appointed an attorney to serve as guardian *ad litem.* Thus, they do not control the issues in the case at bar. Accordingly, mindful of the forgoing discussion, we conclude that the orphans' court did not err in denying Mother's motion to appoint counsel to represent K.M. in addition to the legal counsel Attorney Bellino provided as the guardian *ad litem.*

■ Next, we address collectively Mother's remaining contentions regarding whether CYS demonstrated the statutory grounds to terminate her parental rights pursuant to 2511(a)(8) and (b) and whether CYS made a good faith effort to promote reunification. Initially, we find that the

---

**3.** The orphans' court adopted a similar rationale in rejecting Mother's position that counsel is required to be appointed in every case regardless of whether an attorney is serving as guardian *ad litem.* The orphans' court observed, "If the legislature had intended for [both a guardian *ad litem* and counsel to be appointed in every contested termination proceeding,] it could have so provided. It did not." *Trial Court Opinion,* 2/13/12, at 6. The orphans' court's astute interpretation of § 2313 is consistent with the legislature's most recently proposed amendment to the provision, which expressly directs that attorneys should be appointed to serve as both counsel and the guardian *ad litem.* The proposed amendment provides, in pertinent part, as follows:

§ 2313. Representation.
(a) Child.—The court shall appoint ~~counsel~~ **a guardian ad litem who is an attorney-at-law** to represent the **legal and best interests of the** child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents. The court may appoint ~~counsel or~~ a guardian ad litem **who is an attorney-at-law** to represent any child who has not reached the age of 18 years and is subject to any other proceeding under this part whenever it is in the best interests of the child. No attorney or law firm shall represent both the child and the adopting parent ~~or parents.~~
See 2011 PA H.B. 594 (emphases and strikethroughs in original to indicate proposed additions and deletions).

certified record supports the trial court's conclusion that CYS adduced clear and competent evidence to establish the statutory grounds to terminate Mother's parental rights pursuant to § 2511(a)(8).

Section 2511 provides, in pertinent part, as follows:

### § 2511. Grounds for involuntary termination

(a) **General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

. . . .

(b) **Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(8) and (b).

■ We have explained this Court's review of a challenge to the sufficiency of the evidence to support the involuntary termination of a parent's rights pursuant to § 2511(a)(8), as follows:

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8), the following factors must be demonstrated: (1) The child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child.

*In Re Adoption of M.E.P.*, 825 A.2d 1266, 1275–1276 (Pa.Super.2003). Thus, in order to satisfy the requirements of § 2511(a)(8) in the case at bar, CYS must produce clear and convincing evidence that: (1) K.M. has been removed from Mother for at least twelve months; (2) the conditions which led to K.M.'s removal continue to exist; and (3) involuntary termination of parental rights would best serve K.M.'s needs and welfare. *See In re Adoption of R.J.S.*, 901 A.2d 502 (Pa.Super.2006). "Notably, termination under Section 2511(a)(8), does **not** require an evaluation of Mother's willingness or ability to remedy the conditions that led to placement of her children." *Id.* at 511 (emphasis in original).

Herein, the record supports the trial court's determination that clear and convincing evidence existed to involuntarily terminate Mother's parental rights pursuant to § 2511(a)(8). First, we observe that K.M. has been in CYS care since summer 2009. Hence, CYS satisfied the threshold requirement that K.M. has been removed from Mother for at least twelve months.

Likewise, the certified record establishes that the conditions that led to K.M.'s removal continue to exist and that the involuntary termination of Mother's parental rights would best serve K.M.'s needs

and welfare. During the evidentiary hearing, one of K.M.'s CYS caseworkers, Amy Thomas, was qualified as an expert in social work. N.T., 8/2/11, at 27. Ms. Thomas, who has been with CYS for more than two years, has supervised K.M.'s case since April 2010. *Id.* at 28. She outlined the issues that led to K.M.'s placement, including Mother's parenting deficit and drug use during pregnancy, and highlighted the lack of maturity Mother displayed during the July 2010 episode that spoiled Mother's previous efforts to reunite with K.M. and eventually led CYS to suspend visitation. *Id.* at 33, 42–54.

Ms. Thomas indicated that even though CYS had obtained a court order to suspend visitations in August 2010, the agency continued to offer Mother services and attempted to refer her to outside resources. *Id.* at 71. Ms. Thomas testified that on February 17, 2011, the juvenile court adopted a revised family service plan ("FSP") that included the following parenting goals: 1) participate in mental health counseling; 2) undergo a drug and alcohol treatment evaluation and comply with recommended treatment; 3) submit random drug testing; 4) complete recommended parenting programs; 5) maintain suitable housing; and 6) cooperate with CYS's scheduled and unannounced visits to evaluate her home. *Id.* at 62–64. Unfortunately for Mother, she failed to comply with the revised FSP. Mother did not submit the initial urine screen or provide CYS with the required release to participate in outside services, and she continued to lie to the agency unabashedly. *Id.* at 64–66. For instance, during the February 2011 FSP hearing, Mother advised CYS that she resided with her uncle in Hanover Village. However, after Mother failed to comply with the juvenile court's directive to stay at that location until CYS could obtain a home evaluation, CYS discovered that Mother never resided at that address

and that her uncle did not know Mother's whereabouts. *Id.* at 64–65. The juvenile court eventually found Mother in contempt for her utter failure to comply with the FSP. *Id.* at 67–68. Thus, despite CYS's concerted efforts to remedy Mother's immaturity, poor parenting, and disregard for K.M.'s general safety, these conditions continued to exist.

As it relates to the third prong of § 2511(a)(8), Ms. Thomas testified that terminating Mother's parental rights would have a positive effect upon K.M. because it would permit him to enjoy a normal childhood with his pre-adoptive family that has cared for him since birth. N.T., 11/2/11, at 20–21. Foster Parents are the only family that K.M. has known. *Id.* at 23. Ms. Thomas continued that K.M. is fully assimilated into his foster family and is unaware that he has different biological parents. *Id.* at 22. Moreover, Ms. Thomas indicated that when CYS suspended Mother's visitation during August 2010, K.M. exhibited no negative effects, and his physical health began to improve. *Id.* at 23.

In sum, the certified record reveals that Mother's parenting deficits, characterized by immaturity and dishonesty, and her failure to appreciate K.M.'s safety impaired her ability to care for K.M.; thus, statutory grounds exist to terminate her parental rights. As highlighted by Ms. Thomas's testimony during the evidentiary hearings, CYS presented clear and convincing evidence that K.M. has been removed from Mother for at least twelve months; the conditions that led to K.M.'s removal continue to exist; and involuntary termination of parental rights would best serve K.M.'s needs and welfare. Accordingly, we find that the record supports the trial court's conclusion that CYS satisfied the statutory requirements to terminate Mother's parental rights pursuant to 23

Pa.C.S. § 2511(a)(8). *See In re Adoption of R.J.S., supra.*

 Next, having found that the orphans' court did not abuse its discretion in concluding that CYS proved, by clear and convincing evidence, that termination of Mother's and Father's parental rights was warranted pursuant to section 2511(a)(8), we next address whether the involuntary termination of parental rights would best serve K.M.'s developmental, physical, and emotional needs and welfare pursuant to subsection 2511(b). Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of a child. *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa.Super.2005), *appeal denied*, 587 Pa. 705, 897 A.2d 1183 (2006). The trial court also must discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.* The extent of the bond-effect analysis necessarily depends upon the unique facts and circumstances of the particular case. *In re K.Z.S.*, 946 A.2d 753, 763 (Pa.Super.2008).

 We observe that an orphans' court is not required by statute or precedent to order a formal bonding evaluation by an expert. *In re K.K.R.S.*, 958 A.2d 529, 533 (Pa.Super.2008). Indeed, in assessing the parental bond, the orphans' court is permitted to rely upon the observations and evaluations of social workers. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super.2010). Moreover, the mere existence of an emotional bond does not preclude the termination of parental rights. As we explained in *In re A.S., supra* at 483,

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent.

Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

Herein, Ms. Thomas opined that terminating Mother's parental rights would not be detrimental to K.M. because he no longer shares a bond with Mother. N.T., 11/2/11, at 20–21. She explained that while K.M. had fashioned a bond with Mother initially, he has not seen her in more than one year and would no longer recognize her. *Id.* at 19, 21. Indeed, Ms. Thomas testified that K.M.'s primary relationship is with Foster Parents, whom he refers to as "mom [and] dad." *Id.* at 20. She continued, "He is very attached to them ... It's very appropriate and very obvious that the bonds are extensive and that it's a parent/child bond." *Id.*

 Moreover, K.M. is thriving in Foster Parents' care, and they are satisfying all of his developmental, physical, and emotional needs. *Id.* at 16–17. Ms. Thomas stated that Foster Parents work with K.M. frequently, using age-appropriate play to address his developmental needs. *Id.* at 17. Similarly, Foster Parents enrolled K.M. in a part-time preschool program and music lessons for toddlers. *Id.* at 16. Ms. Thomas also noted that Foster Parents dress K.M. appropriately, provide proper nutrition, and maintain his medical appointments and inoculations. *Id.* Most importantly, Foster Parents shower K.M. with love and affection and provide him with the appropriate attention that he deserves. *Id.* at 16–17. We note that whether a child's primary emotional attachment is with a foster parent rather than a birth parent is a significant factor in evaluating the child's developmental and emotional needs and welfare. *See In re*

*K.Z.S., supra* at 764 ("the bond between [the child] and [foster mother] is the primary bond to protect, given [the child's] young age and his very limited contact with Mother").

Thus, mindful that the needs and welfare analysis is reviewed on a case-by-case basis with consideration of intangible factors such as K.M.'s bonds with Foster Parents, we find sufficient evidence in the certified record to support the orphans' court's determination in this case that terminating Mother's parental rights best served K.M.'s developmental, physical, and emotional needs and welfare.

■■■■■■ Finally, we address Mother's assertion that CYS failed to make good faith efforts to promote her reunification with K.M. The following principles are relevant to Mother's complaint.

Before filing a petition for termination of parental rights, the Commonwealth is required to make reasonable efforts to promote reunification of parent and child. However, the Commonwealth does not have an obligation to make such efforts indefinitely. The Commonwealth has an interest not only in family reunification but also in each child's right to a stable, safe, and healthy environment, and the two interests must both be considered. A parent's basic constitutional right to the custody and rearing of his or her child is converted, upon the parent's failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment. When reasonable efforts to reunite a foster child with his or her biological parents have failed, then the child welfare agency must work toward terminating parental rights and placing the child with adoptive parents. The process of reunification or adoption should be completed

within eighteen (18) months. While this time frame may in some circumstances seem short, it is based on the policy that a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re Adoption of R.J.S.,* 901 A.2d 502, 507 (Pa.Super.2006) (emphasis, citations, and internal quotation marks omitted) (footnote omitted).

Pointing to her initial success with CYS's intervention and the relationship she developed with her then-infant son, Mother complains that by suspending her visitations following the July 2010 ordeal, CYS failed to make a good faith effort to continue to promote reunification. Mother contends that the remaining services CYS provided to her were illusory insofar as her inability to visit K.M. was the definitive obstacle to their reunification. For the following reasons, we disagree that CYS interfered with Mother's ability to reunite with her son.

Simply stated, while CYS secured a court order permitting it to suspend Mother's visitations for safety reasons in August 2010, the agency continued to provide Mother reunification services and arranged referrals for her to participate in outside programs. In fact, CYS drafted a revised FSP outlining the precise components that Mother needed to address to resume her prior successes. Although Mother executed the FSP, which was entered as a court order, she failed to reengage any of the services and was ultimately found in contempt of the juvenile court order adopting the FSP. Indeed, as noted *supra,* Mother not only refused to provide CYS with the releases required to participate in the outside programs, she also resumed her deceitful behavior—lying to the agency about details as benign as the location of her residence. Most telling,

however, is that fact that Mother failed to petition the orphans' court to reinstate visitation with K.M. Hence, upon review of the certified record, it is clear that while Mother complains that CYS reneged meaningful reunification services following August 2010, in reality, Mother simply quit on her son. No relief is due.

For all of the foregoing reasons, we affirm the orphans' court's order terminating Mother's parental rights to K.M. pursuant to 23 Pa.C.S. § 2511(a)(8) and (b).

Order affirmed.