J-S61042-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE:  A.O., a Minor | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF:  J.R.O., Natural Mother | : | Nos. 424, 425 WDA 2016 |

Appeal from the Order February 19, 2016
in the Court of Common Pleas of Bedford County,
Orphans' Court Division, No(s): CP-05-DP-0000021-2014
5 for 2015

BEFORE:  PANELLA, LAZARUS and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:                    **FILED AUGUST 16, 2016**

J.R.O. ("Mother"), the natural mother of A.O., a son born in March 2014, appeals from the Order granting the Petition filed by Bedford County Children and Youth Services ("CYS") to involuntarily terminate her parental rights to A.O. pursuant to Sections 2511(a)(5), (8), and (b) of the Adoption Act.  *See* 23 Pa.C.S.A. § 2511(a)(5), (8), and (b).  We affirm.

On March 9, 2014, CYS received a report that Mother did not possess the knowledge or skills necessary to adequately care for A.O.  On April 11, 2014, Children's Hospital in Pittsburgh admitted A.O., after he was referred by his primary care provider for being underweight.  CYS received Emergency Protective Custody on April 16, 2014.  A.O. entered foster care following his release from the hospital.  On April 29, 2014, A.O. was adjudicated a dependent child and placed in the legal and physical custody of CYS.

CYS established plans to begin the reunification process between Mother and A.O., including services with the Alternative Community Resource Program ("ACRP"), which assists in family preservation, mental health services through Mental Health Mental Retardation Services ("MHMR"), and alcohol and drug services. Mother was also afforded visiting opportunities with A.O. Between April 2014 and June 2014, Mother visited A.O. 22 times. However, Mother discontinued her visits until December 2014, during which she visited A.O. twice. Mother then visited A.O. twice in January 2015, and once each month in March and April 2015.[1] On April 17, 2015, CYS filed the Petition for Involuntary Termination of Parental Rights, seeking termination of Mother's rights and a change in the goal of dependency proceedings to adoption.

During the two termination hearings, the trial court heard testimony from a bonding expert, two agency workers, Mother's current paramour, and Mother. Dennis Kashurba ("Kashurba"), a psychologist and expert on bonding, testified to the lack of a meaningful bond between Mother and A.O. *See* N.T., 11/10/15, at 11-12, 20-23. Further, Kashurba testified that he did see a meaningful bond between A.O. and foster mother. *Id.* at 12-13, 22-23.

Amanda Kendall ("Kendall"), an ACRP family preservation worker, testified that Mother initially did not have any parental instinct, but that

---

[1] After maternal grandmother passed away on April 13, 2015, Mother did not visit A.O.

Mother was responsive to the program. *Id.* at 31-32, 38-40. However, Kendall also testified to Mother's lack of contact with the agency at times, and the gaps in visitation with A.O. *Id.* at 26-29. Kendall testified that Mother did not appear to be interested in reunification, and that she seemed more concerned with other things in life, despite the potential consequence of losing her parental rights. *Id.* at 33-36. Moreover, Kendall testified to Mother's lack of progress toward her Permanency Plan goals, a regression in skills, and that Mother could not gain those skills in a reasonable period of time. *Id.* at 37-38. Additionally, Kendall testified about her concerns with Mother's living situation, such as an overwhelming smell of cigarettes in one of her temporary residences. *Id.* at 41. Finally, Kendall stated that from her observations, there was a lack of a meaningful bond between Mother and A.O. *See id.* at 42-43 (noting that Mother would not initiate contact with A.O., A.O. did not recognize Mother, and A.O. was not distressed when separated from Mother).

Tessa Miller ("Miller"), a CYS worker, testified about Mother's lack of visitation with A.O. *See* N.T., 2/19/16, at 6-10, 12-13. Miller noted Mother's housing instability, citing eighteen different residences in the time span of this case. *Id.* at 11, 19-20. Miller testified to the content of Mother's Permanency Plan goals, her initial cooperation, and to the overall lack of progress toward meeting those goals. *Id.* at 15-17, 20-22. Additionally, Miller stated that the elements of Section 2511(a)(5) and (8)

had been met in this case. *Id.* at 17-18. Miller then testified that she was aware Mother had a new baby during this process, but that the baby was not living with her and had also been the subject of a different county's child services investigation. *Id.* at 23-24.

Jeremy Dodson ("Dodson"), Mother's current paramour, testified that Mother lived with him and his family for a period of time. *See id.* at 27-28, 30-31. Dodson also testified that Mother cares well for the new baby and would be able to take care of A.O. *Id.* at 28-29. Dodson then testified that the new baby has always lived in his parents' home, and that they have tried to take custody of the new baby. *Id.* at 31.

Finally, Mother testified about the stability level of her living situation. *See id.* at 32-34, 36-40, 63-65. Mother acknowledged that while she is formally unemployed, she makes money babysitting. *Id.* at 35, 65. Mother noted the gaps in her visitation, but stated that one gap was the result of her "trying to better [herself]." *Id.* at 41; *see also id.* at 52-53, 59, 61-63 (wherein Mother testified that some of the lack in visitation was attributable to difficulties dealing with the agencies). However, Mother also testified that at one time, she filed a Petition for Increased Visitation, but she failed to appear in court, and has not refiled since that occasion. *Id.* at 60-61. Mother testified that a major problem was her mother's death in April 2015, causing her to feel depressed and unable to handle working with the agencies. *Id.* at 37-38.

In regards to the visits that did take place, Mother testified that the visits were normal, she gave A.O. attention, and that there was a connection between her and A.O. *Id.* at 42-44. Thereafter, Mother testified that she had been taking part in different services at various times that would help her progress toward her Permanency Plan goals, such as parenting classes during the new pregnancy, attending MHMR, attending psychological rehabilitation, and participating in ACRP and Independent Living for portions of the case. *Id.* at 44-51. Mother testified about her concerns with A.O.'s foster care. *Id.* at 53. Subsequently, Mother testified that she and A.O. had a bond at one time, and that she desires custody. *Id.* at 56.

Following the hearings, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(5), (8), and (b), and granted CYS's request for goal change to adoption for A.O. Mother then filed the instant timely appeal and a Pa.R.A.P. 1925(b) Concise Statement.

On appeal, Mother raises three questions for our review:

A. Whether the trial court erred/abused its discretion in determining [that CYS] had established a legal basis through clear and convincing evidence for changing the goal to adoption/terminating [Mother's] parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(5)(8), as such a finding is not supported by the record?

B. Whether the trial court erred/abused its discretion by determining that termination of [Mother's] parental rights would best serve the developmental, physical, and emotional needs and welfare of [A.O.] under 23 Pa.C.S.A. § 2511(b), as such a finding is not supported by the record?

C. Whether the trial court erred/abused its discretion by failing to consider the impact of the death of [maternal grandmother] on [Mother's] efforts to remedy the conditions leading to the placement of [A.O.]?

Brief for Appellant at 3 (issues renumbered).

Our standard of review regarding orders terminating parental rights is as follows:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (citations omitted).

Termination of parental rights is controlled by Section 2511 of the Adoption Act. *See* 23 Pa.C.S.A. § 2511. In termination cases, the burden is upon the petitioner to prove by clear and convincing evidence that its asserted grounds for seeking the termination of parental rights are valid. *See In re R.N.J.*, 985 A.2d at 276. "[C]lear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (citation and internal quotation marks omitted). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations

- 6 -

and resolve conflicts in the evidence." ***In re M.G.***, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted). If competent evidence supports the trial court's findings, "we will affirm even if the record could also support the opposite result." ***In re Adoption of T.B.B.***, 835 A.2d 387, 394 (Pa. Super. 2003) (citation omitted).

Satisfaction of any one subsection of Section 2511(a), along with consideration of Section 2511(b), is sufficient for the involuntary termination of parental rights. ***In re B.C.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). In this case, we will review the trial court's decision to terminate Mother's parental rights based upon Section 2511(a)(8) and (b), which state the following:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**– The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

* * *

**(b) Other considerations.**– The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the

child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)…(8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

"Section 2511(a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the children's removal by the court." *In re A.R.*, 837 A.2d 560, 564 (Pa. Super. 2003). Once the 12-month period has been established, courts must determine whether the conditions that led to the child's removal continue to exist. *Id.* "[T]ermination under Section 2511(a)(8), does not require an evaluation of [a parent's] willingness or ability to remedy the conditions that led to placement of her [child]." *In re Adoption of C.J.P.*, 114 A.3d 1046, 1050 (Pa. Super. 2015) (citation omitted); *see also In re K.M.*, 53 A.3d 781, 789 (Pa. Super. 2012). The "relevant inquiry in this regard is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009). With respect to the "needs and welfare" analysis, this Court observed the following:

[T]he focus in terminating parental rights is on the parent, under Section 2511(a), whereas the focus in Section 2511(b) is on the child. However, Section 2511(a)(8) explicitly requires an evaluation of the "needs and welfare of the child" prior to proceeding to Section 2511(b), which focuses on the

- 8 -

developmental, physical and emotional needs and welfare of the child. Thus, the analysis under Section 2511(a)(8) accounts for the needs of the child in addition to the behavior of the parent. Moreover, only if a court determines that the parent's conduct warrants termination of his or her parental rights, pursuant to Section 2511(a), does a court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. Accordingly, while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*In re Adoption of C.L.G.*, 956 A.2d 999, 1008-09 (Pa. Super. 2008) (*en banc*) (citations and some quotation marks omitted).

In her first issue, Mother asserts that CYS did not present clear and convincing evidence supporting termination of her parental rights pursuant to Section 2511(a)(8). *See* Brief for Appellant at 6, 9-10. Mother also claims that the progress she made toward her Permanency Plan goals and her improvements in parenting skills weighed against a change in goal from reunification to termination of parental rights and adoption. *Id.* at 8-9.

Our review of the record discloses that CYS was granted Emergency Protective Custody on April 16, 2014, and filed the Petition for Involuntary Termination on April 17, 2015. *See* N.T., 2/19/16, at 17-18; *In re A.R.*, 837 A.2d at 564. Further, the conditions which led to A.O.'s removal continue to exist. *See* N.T., 11/10/15, at 33-38, 41; N.T., 2/19/16, at 11, 16-17, 19-20, 65. Indeed, despite initial participation in reunification

programs, there was no progress toward Mother's Permanency Plan goals. *See In re D.A.T.*, 91 A.3d 197, 206 (Pa. Super. 2014) (finding termination proper where not all goals were completed, despite the mother completing some of the goals). Additionally, Mother's parenting skills regressed, Mother inconsistently participated in the treatment programs, and there was no improvement in Mother's residential or economic stability. *See In re Adoption of R.K.Y.*, 72 A.3d 669, 680 (Pa. Super. 2013) (using instability of housing as support for termination).

Moreover, the trial court considered the needs and welfare of A.O. *See In re Adoption of C.L.G.*, 956 A.2d at 1008-09. The trial court found no meaningful bond between Mother and A.O., evidenced by A.O.'s lack of distress when separated from Mother. *See* N.T., 11/10/15, at 11-12, 20-23, 42-43. Alternatively, the evidence showed a strong, beneficial bond between A.O. and his foster family. *Id.* at 12-13, 22-23.

Analyzing Section 2511(a)(8), we conclude that the trial court's determinations are supported by competent evidence. Thus, termination under Section 2511(a)(8) is appropriate.

In her second issue, Mother avers that the trial court did not complete a full examination regarding the best interests of A.O., as required by Section 2511(b), and that it specifically omitted a discussion as to the natural bond between a biological parent and child. *See* Brief for Appellant at 11-14.

Section 2511(b) "focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010). "While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (citation omitted).

> [I]n assessing the parental bond, the [trial] court is permitted to rely upon the observations and evaluations of social workers. Moreover, the mere existence of an emotional bond does not preclude the termination of parental rights….
>
> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, … the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re K.M.*, 53 A.3d at 791 (citations omitted).

Here, A.O. has spent all but one month of his life in foster care. *See In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010) (considering placement with a foster family for nearly the child's whole life and concluding that there is no meaningful bond between child and natural parent, but rather a bond with the foster family that would be detrimental to sever). Kashurba, an expert on bonding, determined there was not a meaningful bond between

Mother and A.O. *See* N.T., 11/10/15, at 11-12, 20-23; *see also In the Interest of B.C.*, 36 A.3d 601, 611 (Pa. Super. 2012) (stating that "in cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists."). Indeed, Kendall testified that Mother would often times not acknowledge A.O. on her own during visitation, A.O. did not react to Mother because he did not know her, and A.O. showed no distress when being separated from Mother. *See* N.T., 11/10/15, at 42-43. Kashurba also noted a bond between the foster family and A.O. *See id.* at 13 (stating that "[a]ll in all, there's little question in this examiner's mind that one would be quite hard pressed to find a better family arrangement for [A.O. than] that which is provided by his current foster parents."); *see also In re K.M.*, 53 A.3d at 791 (stating that "whether a child's primary emotional attachment is with a foster parent rather than a birth parent is a significant factor in evaluating the child's developmental and emotional needs and welfare."). The trial court was free to rely on the observations of Kashurba and Kendall, *see In re K.M.*, 53 A.3d at 791, and we discern no abuse of discretion or error of law, as competent evidence supports the conclusions of the trial court.

In her final issue, Mother alleges that the trial court did not give enough weight to the effects of maternal grandmother's death on Mother's efforts at reunification, stating that the emotional trauma rendered her

incapable of fully participating in the reunification process. Brief for Appellant at 10-11.

"Our law is well established that once a child is removed from the care of the parent, the burden is on the parent to take action to regain parental rights." *In the Interest of B.C.*, 36 A.3d at 609; *see also In re Z.P.*, 994 A.2d 1108, 1118-19 (Pa. Super. 2010) (holding that parental obligation is a positive duty which requires affirmative performance). Although Mother went through a tragedy, "[a] child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *In re Adoption of M.E.P.*, 825 A.2d 1266, 1276 (Pa. Super. 2003).

Here, maternal grandmother passed away a couple of days prior to the filing of the termination Petition. Miller testified that although Mother was not cooperative with the bulk of services provided after maternal grandmother passed away, "[i]t was before that[,] too[.]" N.T., 2/19/16, at 22. Thus, Mother's final claim does not entitle her to relief.

Based upon the foregoing, the Order to involuntarily terminate Mother's parental rights to A.O. was proper under Section 2511(a)(8) and (b).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/16/2016