J-A07019-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF B.J.L.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: W.L.B., JR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1520 MDA 2023 |

Appeal from the Decree Entered September 19, 2023
In the Court of Common Pleas of Franklin County
Orphans' Court at No(s): 19-ADOPT-2023

BEFORE:   STABILE, J., SULLIVAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY SULLIVAN, J.:                    **FILED: APRIL 12, 2024**

W.L.B., Jr. ("Father") appeals from the decree granting the petition filed by maternal grandparents, T.L.M. ("Maternal Grandfather") and T.R.M. ("Maternal Grandmother") (collectively, "Maternal Grandparents"), to involuntarily terminate Father's parental rights to his son, B.J.L.B. ("Child"), born in November 2014.[1]  We affirm.

The relevant facts and procedural history are as follows.  Child was born to Mother and Father ("Parents") who were and are still married.  **See** N.T., 9/5/23, at 6-7.  Child came to live with Maternal Grandparents in October 2015, at the age of eleven months at Mother's request because she and Father were using drugs and living in abandoned buildings.  **See id**. at 28.  Child and a

---

[*] Former Justice specially assigned to the Superior Court.

[1] D.R.B., Child's mother ("Mother") signed a consent to termination of her parental rights.  **See** N.T., 9/5/23, at 73.

sister ("Sister"), had been in the care of a babysitter with whom parents left Child and Sister. *See id*. at 7-8. At the time Maternal Grandparents received the children, Sister had a broken nose and Child had received no medical care, including immunizations, since birth, and, as Maternal Grandmother testified, Parents did not have a home. *See id*. at 8-10, 23, 25. Both Maternal Grandparents testified Father signed guardianship documents for them. *See id*. at 8-10, 25, 62. Child has been in Maternal Grandparents' exclusive and continuous care since. *See id*. at 26. Maternal Grandfather testified adoption would be in Child's best interest. *See id*. at 63.

At eleven months old, Child had not met developmental goals: he could not crawl or roll over, had not reached normal weight, and slept twenty-one hours per day. *See id*. at 9, 23-24. Maternal Grandparents had to help him develop muscle tone and get him the medical care of which Parents deprived him. *See id*. at 14. Father last saw Child in January 2016, and since 2017, had not sent cards, birthday greetings, letters, or other communications, or provided financial support, gifts, or necessities for Child until the date of the September 2023 hearing. *See id*. at 10-12, 45-46, 51. In November 2022, Father sent a letter to Maternal Grandparents' lawyer, in response to Maternal Grandparents' request for consent to adopt Child. *See id*. at 21. Father responded by asking about Child, although he did not ask to see Child or ask how he was doing at school. *See id*. at 46. Father did not contact Maternal Grandparents, who have lived at the same address for twenty-one years and

had the same phone number for nearly twenty years. *See id*. at 13, 18-19, 22.

At the time of the hearing, Child was in third grade and had appropriate age level interests and abilities, despite an ADHD diagnosis. *See id*. at 14-15. Child sees a psychiatrist monthly, has seen photos of his father provided by Maternal Grandparents, and received occasional visits from Mother. *See id*. at 14-15. Child regards Maternal Grandparents as his parents. *See id*. at 15-16.

Father testified at the hearing he was about to finish a two-year sentence for a probation violation. *See id*. at 33. He admitted he had not seen Child since November 2015. *See id*. at 34-35. He testified he took Child to a doctor twice when Child was in his care during Mother's incarceration. *See id*. at 36. Father claimed he did not sign the guardianship documents. *See id*. at 36-37, 43, 48. He testified he was incarcerated in 2016 for theft and was released in 2019 for five or six months before being incarcerated for another theft conviction. *See id*. at 37, 49. He stated he wrote to Child in care of Maternal Grandmother. *See id*. at 37-38. He testified that, in July 2019, he went to Maternal Grandparents' house and waited there for one and one-half hours, and stopped by in August 2019, after visiting his mother. On that occasion, the house appeared completely dark. *See id*. at 38-39.[2] He said he did not

---

[2] For the nine years prior to the hearing, Maternal Grandparents had spent summers in Virginia, with periodic returns to Pennsylvania. *See id*. at 13, 18-19, 65.

attempt to make other contact with Maternal Grandparents because he did not have their phone number. *See id*. at 39. He testified he still wanted a relationship with Child and wanted to get to know Child. *See id*. at 40. He admitted he did not send Child a letter after 2017. *See id*. at 45-46, 51.

Father stated he does not want to take Child from Maternal Grandparents but wants a relationship with Child. *See id*. at 53. He testified Maternal Grandparents have provided Child everything he needs, including a home, medical care, and financial support he could not provide. *See id*. at 55.

At the conclusion of the hearing, the Orphans' Court held the matter under advisement. On September 18, 2023, the court entered a decree terminating Father's parental rights, and ordered custody of Child be granted to Maternal Grandparents. Father filed a timely notice of appeal and a contemporaneous statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). The Orphans' Court complied with Rule 1925(a).

Father presents the following issues for our review:

1.    Whether the [Orphans' C]ourt abused its discretion by determining that Father's conduct evidenced a settled purpose of relinquishing his parental rights or that Father has failed to perform his parental duties, particularly as it relates to the impediments or barriers that existed preventing Father's contact with . . . Child[?]

2.    Whether the [Orphans' C]ourt abused its discretion by determining that there was clear and convincing evidence that the developmental, physical and emotional needs of [Child] would be best served by termination of parental rights . . .[?]

Father's Brief at 13.

An appellate court reviews an involuntary termination decree for an abuse of discretion, which limits its review to a determination of whether competent evidence supports the termination court's decree. *See In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). An appellate court must accept the Orphans' Court's findings of fact and credibility determinations which the record supports. *See Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). Where the record supports the Orphans' Court's factual findings, an appellate court may not disturb that court's ruling absent an error of law or abuse of discretion. *See In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021). An abuse of discretion exists where there is a demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *See id*. Section 2511 of the Adoption Act governs the involuntary termination of parental rights. If the Orphans' Court determines the petitioner established grounds for termination under section 2511(a) by clear and convincing evidence, then it must assess the petition under section 2511(b), which focuses on the Child's needs and welfare. *See* 23 Pa.C.S.A. § 2511; *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

In this case, the Orphans' Court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), and (b), which provide as follows:

**(a) General rule.**—The rights of a parent in regard to a Child may be terminated after a petition filed on any of the following grounds:

(1)    The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of

- 5 -

relinquishing parental claim to a Child or has refused or failed to perform parental duties.

\* \* \* \* \*

**(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the Child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1) . . . the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

Concerning proof of subsection 2511(a)(1), this Court has stated:

To satisfy the requirements of section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a Child or a refusal or failure to perform parental duties. In addition,

> [s]ection 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a Child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to [s]ection 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a Child or fails to perform parental duties.

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and Child; and (3) consideration of the effect of termination of parental rights on the Child pursuant to [s]ection 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008) (internal citations omitted). Clear and convincing evidence is that which is so clear, direct, weighty, and convincing as to allow the trier of fact to reach a clear conviction, without hesitance, of the truth of the precise facts in issue. *See In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000).

The Orphans' Court must consider the whole history of a given case and not mechanically apply the six-month statutory provisions. *See In re D.J.S.*, 737 A.2d 283, 286 (Pa. Super. 1999); *see also In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (stating the Orphans' Court must consider the explanations offered by the parent facing termination of parental rights, to determine if the evidence clearly warrants the involuntary termination). Regarding post-abandonment conduct:

> to be legally significant, [it] . . . must be steady and consistent over a period of time, contribute to the psychological health of the Child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-Child relationship and must also demonstrate a willingness and capacity to undertake the parental role. The parent wishing to reestablish his parental responsibilities bears the burden of proof on this question.

*In re Z.P.*, 994 A.2d 1108, 1119 (Pa. Super. 2010) (internal citation omitted).

Regarding the definition of "parental duties," this Court has stated:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a Child. A Child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the Child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance.

> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the Child and a genuine effort to maintain communication and association with the Child.
>
> Because a Child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the Child's life.
>
> ***Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-Child relationship to the best of his or her ability, even in difficult circumstances.*** A parent must utilize all available resources to preserve the parental relationship[] and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-Child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the Child with . . . her physical and emotional needs.

*In re B., N.M.*, 856 A.2d at 855 (internal citations and quotations omitted) (emphasis added); *see also In re E.S.M.*, 622 A.2d 388, 393 (Pa. Super. 1993) (noting while the failure to perform parental duties is excused where it is the product of obstructive tactics, a parent cannot obtain the benefit of that excuse unless she has exercised reasonable firmness in attempting to overcome the obstructive behavior). The fact of incarceration does not in itself provide grounds for termination of parental rights. "However, a parent's responsibilities are not tolled during incarceration. The focus is on whether the parent utilized resources available while in prison to maintain a relationship with his or her child." *See B., N.M.* 856 A.2d at 855.

Father asserts he availed himself of the limited resources available while incarcerated. He avers he did not have Maternal Grandmother's phone number

and had no way of calling Child from prison. He asserts after sending two cards without response in 2017, sending any further cards would have been futile. *See* Father's Brief at 24. Father also claims he made two futile visits to the Maternal Grandparents' home in Summer 2019, there was no evidence he could have visitors in prison, and he wrote to Maternal Grandparents' attorney to find out about the Child. *See* Father's Brief at 25-26.

The Orphans' Court found Father's testimony that he did not sign the guardianship documents for the Child incredible. *See* Trial Court Opinion, 11/2/23, at 3. The court found Father's two alleged visits to Maternal Grandparents' home in Summer 2019, and his failure to write cards or deliver gifts to Child prior to reincarceration, inadequate to establish a relationship with Child. *See id*. at 4-5. Finally, the court noted Father provided little to no financial or emotional support to Child and manifested "an overall ambivalence or genuine lack of interest" in maintaining a relationship with Child. *See id*. at 5. Accordingly, the court found clear and convincing evidence to establish the conditions of section 2511(a)(1).

We perceive no abuse of discretion in the Orphans' Court's determination. Father's conduct evidenced a settled purpose of relinquishing his parental rights and failure to perform parental duties. Father's desultory efforts to maintain a relationship with Child – two letters in 2017 and two failed attempted visits in 2019 – do not constitute the exercise of "reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship." *In re B., N.M.*, 856 A.2d at 855. They are, at best,

sporadic and half-hearted – Father left no note for Child or Maternal Grandparents when he made those two alleged visits. Moreover, Father freely admitted he provided Child no emotional or financial support. The record the Orphans' Court relies upon established clear and convincing evidence that Father showed a settled intent to relinquish his parental claim and failure to perform parental duties pursuant to section 2511(a)(1).

Father's second issue challenges the Orphans' Court's finding termination of his parental rights would be in Child's best interest.

A section 2511(b) analysis focuses on the developmental, physical, and emotional needs and welfare of the Child, *see* 23 Pa.C.S.A. § 2511(b), including "[i]ntangibles such as love, comfort, security, and stability," ***In re K.M.***, 53 A.3d 781, 791 (Pa. Super. 2012), and a consideration of the parent-child bond. ***See In re E.M.***, 620 A.2d 481, 485 (Pa. 1993). "Common sense dictates that courts considering termination must also consider whether the [child is] in a pre-adoptive home and whether [he] has a bond with [his] foster parents." ***See In re T.S.M.***, 71 A.3d 251, 268 (Pa. 2013).

Father asserts there is no evidence regarding any parent-child bond and that although he has not seen or interacted with Child since January 2016, he cared for Child in Child's first eleven months of life, and there is no evidence Child will not be harmed by the termination of parental rights. ***See*** Father's Brief at 28.

The Orphans' Court found Maternal Grandparents credible. The court credited their testimony about their care of Child in the more than seven years

since they assumed custody when Child was less than one year old, and their testimony that the Child is thriving physically and emotionally. *See* Orphans' Court Opinion, 11/2/23, at 6.

The record is wholly devoid of any evidence of a Father-Child bond. Father has not seen or communicated with Child since Child was less than one year old. Meanwhile, Child has been cared for exclusively by Maternal Grandparents who have satisfied all his needs for shelter, medical care, education, and emotional support, having helped Child catch up with age-level growth levels, attended to his ADHD, and funded psychiatric care. We find no abuse of discretion in the Orphans' Court's determination. See *K.M.*, 53 A.3d at 791; *E.M.*, 620 A.2d at 485; *T.S.M.*, 71 A.3d at 268.

Based on the foregoing, we affirm the decree involuntarily terminating Father's parental rights.

Decree affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 04/12/2024