J-A19005-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: A.J.C., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: CHESTER COUNTY | : | |
| DEPARTMENT OF CHILDREN, YOUTH | : | |
| AND FAMILIES | : | |
| | : | |
| | : | |
| | : | No. 955 EDA 2019 |

Appeal from the Order Entered February 26, 2019
In the Court of Common Pleas of Chester County
Domestic Relations at No(s):  AD-17-0077

BEFORE:   PANELLA, P.J., KUNSELMAN, J., and STEVENS*, P.J.E.

MEMORANDUM BY PANELLA, P.J.:                    **FILED OCTOBER 11, 2019**

The Chester County Department of Children, Youth and Families ("CYF" or the "Agency") appeals from the decree entered February 26, 2019, denying CYF's petitions seeking to involuntarily terminate the parental rights of R.M. ("Mother") and R.C., Jr. ("Father"), to their son, A.J.C. ("Child").  After careful review, we affirm.

Child's family came to the attention of CYF in 2013.[1]  *See* N.T., 1/9/19, at 13.  CYF received an allegation that Child's step-father, R.H. ("Step-father"), performed "a choking game on [Child] called Deep Ten."  *See id.* at

_____

* Former Justice specially assigned to the Superior Court.

[1] At that time, Father, who has a lengthy criminal history, was in prison.  *See* N.T., 1/9/19, at 5-8.   In 2010, Father pled guilty to numerous crimes, receiving sentences of eight to sixteen years and a consecutive six to twelve year sentence.  *See id.* at 7-8.  His minimum release date is in 2023.  *See id.*  Further, Father is classified as a sexually violent predator.  *See id.* at 81.

13-14. Additionally, CYF learned that Child was diagnosed with Sydenham chorea, a condition caused by an untreated bacterial infection that requires monthly antibiotic shots. *See id.* at 14. Mother was not appropriately treating his condition. *See id.* CYF instituted a safety plan and Child was returned home. *See id.* at 14-15.

Thereafter, CYF received additional reports regarding Child alleging Mother left Child overnight with a caregiver and did not report when she would return. *See id.* at 17-18. Further, there were allegations that Mother used drugs and alcohol and was unable to care for her children. *See id.* at 18.

In July 2016, the court adjudicated Child dependent. *See* Master's Recommendation for Adjudication and Disposition-Child Dependent and Order, 7/15/16. Legal and physical custody of Child was transferred to Step-father. *See id.* at 2.

On August 12, 2016, Child was removed from Step-father's home because Step-father acknowledged using cocaine. *See* Master's Recommendation-Status Review and Order, 8/19/16, at 1-2. Legal and physical custody of Child was transferred to CYF. *See id.* at 2. Following Child's removal, Child was initially placed in the foster home of W.C. and E.C. *See* Master's Recommendation-Permanency Review and Order, 1/12/17, at 1. However, the foster parents notified CYF that they could no longer care for Child and he was transferred to the foster home of D.S. *See id.* at 2.

In December of 2017, Child was reunited with Step-father. ***See*** Permanency Review Order, 12/11/17, at 1. The reunification was short-lived and, in April of 2018, Child was removed from Step-father's home after threatening Step-father's girlfriend. ***See*** Status Review Order, 5/7/18, at 1-2.

On August 2, 2018, CYF filed amended petitions to involuntarily terminate Mother's and Father's parental rights to Child.[2] The court conducted hearing on CYF's petitions on January 9, 2019.[3] CYF presented the testimony of Leilany Davila, a CYF caseworker. Mother and Father both testified on their own behalf.

Based upon the testimony presented at the hearing, the orphans' court made the following findings of fact:

> A.J.C. is now 13 years of age. CYF investigated A.J.C.'s family beginning on August 23, 2013 when it was reported that [Step-father], and father of A.J.C.'s half-sister, repeatedly choked A.J.C. until he passed out. A.J.C. was only eight years old when this occurred. The stepfather choked the child for unknown reasons using a maneuver known as "Deep Ten". The agency closed its investigation of stepfather's conduct on August 28, 2014.
>
> A.J.C. was removed from Mother's care on August 12, 2016 due to Mother's continuing drug and alcohol problems. He was placed in foster care at that time and remained there until December 11, 2017[,] when he was reunified with his sister and his stepfather.

---

[2] On October 25, 2017, CYF filed petitions to involuntarily terminate Mother's and Father's parental rights to Child. However, on December 14, 2017, CYF filed a praecipe to withdraw the petitions. The amended petitions filed by CYF in August 2018 were filed at the same docket as the 2017 petitions.

[3] Prior to the hearing, the court appointed Attorney Cecil Roy Hoskins, III, to represent Child. At the hearing, Attorney Hoskins represented that he spoke with Child regarding the termination of Father's parental rights and described Child's position as "ambivalent." ***See*** N.T., 1/9/19, at 118-19.

However, in April of 2018, [Step-father] refused to allow A.J.C. to live with A.J.C.'s sister and him anymore, and apparently ended all contact with A.J.C. Until [Step-father]'s abandonment of A.J.C., A.J.C. had viewed [Step-father] as a father figure in his life. A.J.C. has lived with multiple foster care families since he was first removed from Mother and stepfather.

### A.J.C.

A.J.C. has a rare condition called Sydenham [c]horea which requires him to have monthly antibiotic shots. Left untreated this condition can be fatal. A.J.C. currently is diagnosed with [Attention Deficit Hyperactivity Disorder ("ADHD")] but is not receiving medication. A.J.C. is in seventh grade. He is not doing well in school and is currently refusing to do schoolwork. He is significantly behind in at least some of his academic work.

A.J.C. is currently in a specialized foster home. The foster parents, a husband and wife, have additional training to work with children who have experienced significant trauma in their life. No other children reside in this household. A.J.C.'s relationship with his foster parents is inconsistent. He struggles with their structured environment and does not want to be told by them what to do.

A.J.C. was hospitalized for eight days, beginning on December 4, 2018, for self-harming behaviors. He was cutting himself. He tends to be very emotional and can be very depressed. This recent hospitalization was related to A.J.C. feeling that he no longer had control over his circumstances. Those circumstances included a break up with a girlfriend, not having parents and fighting with his grandmother, who had been a constant in his life, but who is now viewed by A.J.C. as someone he no longer wants to see as often. They additionally include the fact that he no longer resides with his sister.

Lastly, A.J.C. is aware that his [f]ather is incarcerated and cannot provide care for him. A.J.C. understands that if his [f]ather's parental rights are terminated, A.J.C. would no longer be taken by a CYF worker to see his [f]ather and that his [f]ather's telephone calls to him could stop. A.J.C. is against losing contact with his [f]ather. A.J.C.'s current foster parents are aware that A.J.C.'s relationship with his [f]ather is a top priority for A.J.C. and are willing to assist him in maintaining contact with his [f]ather.

### Father's relationship with A.J.C.

Father was present at A.J.C.'s birth. Father obtained a 72-hour furlough from prison/work-release which let him attend the delivery. Prior to 2009 and Father's continuing incarceration, he regularly would see A.J.C. At the time, he lived a half-mile away from A.J.C. and Mother. Even in that early stage in A.J.C.'s life, Father's relationship with A.J.C. was very good. A.J.C. was almost four years old when Father began his present incarceration in 2009.

Father continued to maintain contact with A.J.C. after he was sent to the state penitentiary. Many years ago, Father attempted to transfer to a penitentiary closer to A.J.C. to help facilitate his relationship with him. Based upon information provided to him, Father anticipates that a transfer to a closer facility will occur this year. Father has had generally good behavior while incarcerated. He has not had a misconduct write up within the past eight years. He has also attempted to improve himself by taking 438 hours of academic classes and 110 hours of vocational classes. He is currently taking GED classes. After Father's incarceration in 2009, but prior to CYF's involvement with A.J.C.'s family, A.J.C. visited with Father in the penitentiary. The child's maternal grandmother would transport A.J.C. for those visits. They visited approximately two times per year. Beginning in early 2018, CYF began to accommodate regular monthly visits between A.J.C. and Father. These monthly visits last for approximately 1 1/2 to 2 hours. Both Father and A.J.C. look forward to these monthly visits and they go very well. A.J.C. enjoys seeing Father. Father is employed at the penitentiary. Beginning in approximately March of 2018, Father began to send small checks to CYF for A.J.C. to purchase food. He also uses money from his prison job to pay for telephone calls between Father and A.J.C.

Father and A.J.C. have regular telephone conversations approximately three or more times per week. These telephone calls between Father and A.J.C. started in approximately July of 2018. At about the same time, Father and A.J.C. began to regularly exchange emails. Father is persistent with his emails even though A.J.C. does not always respond to them. Even prior to the telephone calls and emails, Father would send birthday cards to A.J.C. During the visits between Father and A.J.C. there is a lot of conversation between them. Father asks his son good questions. Father seems to be very interested in what's going on with A.J.C. and does not hesitate to explore the basis for any anger that A.J.C. may have. There is quality time that happens between Father and A.J.C. during these visits and A.J.C. seems to

be really happy to see his [f]ather. During the visits, Father and A.J.C. speak about members of A.J.C.'s family and things that are bothering A.J.C. During one of his visits Father asked A.J.C. "what am I in your life" to which A.J.C. responded, "Dad". Father and A.J.C. speak about A.J.C.'s relationship with his [m]other. He reminds A.J.C. that Mother should still hold a special place in his life as the person who gave birth to him. Father encourages A.J.C. to keep a relationship with Mother even though he may be angry with her. When Father spoke with A.J.C. in December of 2018, Father inquired about A.J.C.'s self-harming behavior and hospitalization that month. A.J.C. was open to him about the circumstances that made him upset, was happy to have this interaction with Father and displayed no signs of distress.

A.J.C. has told Father that he wants to continue to see him in prison. Both Father and A.J.C. want these visits to continue. Father loves A.J.C. and considers A.J.C.'s welfare to be the most important thing in Father's life. While in prison, Father has done a great deal, if not everything at his disposal, to stay in touch with A.J.C. A.J.C.'s maternal grandmother is not a potential adoptive resource for A.J.C. and is supportive of A.J.C.'s relationship with Father. A.J.C.'s relationship with Father has grown over the years. A.J.C. and Father have developed a strong parent-child bond. Father intends to continue to maintain his relationship with A.J.C. if he retains his parental rights. He is willing to do whatever CYF asks him to do in order to maintain that relationship. If Father's parental rights are not terminated, CYF will continue to provide transportation for A.J.C. to visit with Father. Additionally, A.J.C.'s maternal grandmother is also anticipated to take A.J.C. to visit with Father if Father's parental rights are not terminated.

### Summary of material findings of fact and reasonable inferences

Presently, there are no identified adoptive resources for A.J.C. A.J.C. wants his contact with Father to continue. A.J.C. does not consent to the termination of his [f]ather's parental rights. A.J.C. has lost close relationships with his [m]other and stepfather. He has lost close contact with his sister. His relationship with his maternal grandmother has significantly deteriorated. His relationship with his foster parents is inconsistent. He appears to have given up at school. In early December 2018, A.J.C. intentionally cut himself so severely that he was hospitalized for eight days; this self-harming behavior resulted from A.J.C. feeling that he has lost control of his circumstances. No adult is more

bonded with A.J.C. than Father. No adult has a more meaningful relationship with A.J.C. than Father. A.J.C.'s tendency to be very emotional and his susceptibility to deep depression would be triggered by the sudden removal of Father from his life. Elimination of Father from A.J.C.'s life would destroy an existing, necessary and beneficial relationship in his life, would emotionally devastate him and could lead to more self-harming behaviors.

Orphans' Court Opinion, 4/10/19, at 2-6. (citations to the record, footnotes, and internal paragraphing omitted).

On February 26, 2019, the court entered a decree denying CYF's petitions. The court determined that CYF met its burden of proof pursuant to 23 Pa.C.S.A. § 2511(a). However, the court concluded that terminating Father's parental rights would not meet the best interests of Child, and therefore denied the petition with respect to Father pursuant to 23 Pa.C.S.A. § 2511(b). Although the court concluded that CYF established grounds for the involuntary termination of Mother's parental rights pursuant to Section 2511(a) and (b), the court denied CYF's petition with respect to Mother as CYF insisted that the court terminate the parental rights of both parents or neither parent. *See* N.T., 1/9/19, at 119. CYF timely filed a notice of appeal and concise statement of errors complained of on appeal.

On appeal, CYF raises the following issues for our review:

A. Whether, in circumstances where clear and convincing evidence supported termination of Father's parental rights under 23 Pa.C.S. §§ 2511(a)(1), (2), (5) and (8), the [o]rphans' [c]ourt abused its discretion and/or erred as a matter of law in determining that under the 23 Pa.C.S. § 2511(b) best interests analysis, Father's parental rights should not be terminated?

B. Whether the [o]rphans' [c]ourt's factual findings-that Father continued to maintain contact with the minor child after Father was sent to the state penitentiary, and that prior to CYF's involvement in this matter, Father and the minor child would visit approximately two times per year-were supported by clear and convincing evidence in the record?

C. Whether the [o]rphans' [c]ourt abused its discretion and/or erred as a matter of law in considering, under the 23 Pa.C.S. § 2511(b) best interests analysis, efforts by Father undertaken subsequent to the giving of notice of the filing of the October 2017 petition for termination of parental rights?

D. Whether, in circumstances where the minor child has significant health and behavioral issues, and where Father has been incarcerated almost continuously since the minor child was 3 years old and will not be paroled before the child reaches majority, the [o]rphans' [c]ourt abused its discretion and/or erred as a matter of law in determining that under the 23 Pa.C.S. § 2511(b) best interest analysis, Father's parental rights should not be terminated, thereby effectively condemning the child to be raised in foster care for the remainder of his childhood, contrary to the goals of the child welfare system?

E. Whether, in circumstances where clear and convincing evidence supported termination of parental rights of both Mother and Father under 23 Pa.C.S. §§ 2511(a)(1), (a)(2), (a)(5) and (a)(8), and 2511(b), the [o]rphans' [c]ourt abused its discretion and/or erred as a matter of law in failing to terminate the parental rights of both Mother and Father?

CYF's brief at 4-5 (suggested answers and footnote omitted).

We review these claims mindful of our well-settled standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial

court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. § 2101-2938, which requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). Moreover, we have explained, "[t]he standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" *Id.* (*quoting In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

In this case, the orphans' court denied CYF's petition to involuntarily terminate Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(b).[4] Section 2511(b) provides as follows:

**§ 2511. Grounds for involuntary termination**

* * *

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

As to Section 2511(b), our Supreme Court has stated as follows:

[I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

---

[4] No party challenges the orphans' court's conclusion that CYF established grounds for termination pursuant to Section 2511(a).

*In re T.S.M.*, 71 A.3d at 267.

Generally, this Court has stated that a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re L.M.*, 923 A.2d 505, 512 (Pa. Super. 2007). We have stated that a "child's life 'simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.'" *In re Z.P.*, 994 A.2d 1108, 1125 (Pa. Super. 2010). Our Supreme Court has instructed, however, that this Court should defer to the trial court where a "close call" was made. *See R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010).

> Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, 650 A.2d 1064, 1066 (Pa. 1994).

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012).

As CYF's issues are interrelated, we address them together. CYF asserts there is a dearth of evidence that Father had any meaningful contact with Child before CYF initiated contact between Father and Child in 2018. *See* CYF's brief at 21-22. CYF contends that the orphans' court erred in concluding that Father and Child maintained contact after Father was imprisoned and that Father and Child visited twice per year. *See id.* at 19-24. Accordingly, CYF argues the court improperly considered the communication and visits between

Father and Child because they occurred only after CYF originally filed its termination petition in October 2017. *See id.* at 24-28. CYF asserts that, removing this evidence, there was "negligible evidence of Father's prior participation in A.J.C.'s life during Father's incarceration." *See id.* at 27.

Moreover, CYF notes that Father has been in prison for much of Child's life, but Father did not start sending money or emails until 2018, and sent limited birthday cards and pictures. *See id.* at 20-21. Further, CYF contends that Father will be incarcerated until after Child turns 18. *See id.* at 29-30. CYF argues that, despite Father's good intentions, he is incapable of providing the focused attention Child requires. *See id.* at 30. Instead, CYF asserts that, by denying its petition, the orphans' court has "condemn[ed Child] to be raised in foster care for the remainder of his childhood, without permanency, contrary to the goals of the child welfare system." *See id.* at 32. CYF concludes the court erred in denying its petition, as terminating Father's parental rights would best serve Child's needs and welfare. *See id.*

The orphans' court denied CYF's petition to involuntarily terminate Father's parental rights pursuant to Section 2511(b), explaining, in part:

> This court is greatly concerned with A.J.C.'s recent history of self-harming behavior, school issues, removal from his half-sister and conflict in his relationships with his [m]other, his foster parents, his stepfather and his maternal grandmother, all of which were or may be attributed to his feeling in December[] 2018 that he did not have control over his circumstances. The then[-] pending hearing to determine if his [f]ather's parental rights would be terminated may also have been a contributing factor. When A.J.C. visited with Father after his self-harming hospitalization they freely discussed A.J.C.'s difficulties. Rather than appearing

- 12 -

depressed with Father, A.J.C. appeared happy. The emotional fragility of this child and his meaningful relationship with Father indicate that termination of Father's rights would destroy an emotional bond that is necessary and beneficial to A.J.C.

***

[T]he credible evidence supports the finding that there was a strong bond between Father and A.J.C. which predated September 6, 2018[, the date CYF served its amended petition]. That bond was genuine, not false, feigned or artificial. The bond between Father and A.J.C. has existed for years but has grown stronger and closer over time. The court is required to consider it, not ignore it. Presently their relationship is the most consistent and meaningful in A.J.C.'s life. Father did not initiate efforts to create this bond after September 6, 2018. It is this unique parent-child bond, and the devastating emotional effect upon A.J.C. that would result from the elimination of it, which le[]d this court to deny termination pursuant to 2511(b).

Orphans' Court Opinion, 4/10/19, at 11, 15.[5]

Our review of the record supports the trial court's conclusion. Leilani Davila, the caseworker from CYF, testified regarding the family, including the relationship between Father and Child. Davila testified Father has been incarcerated since Child was three years old and Child will be eighteen prior to Father's release from prison. *See* N.T., 1/9/19, at 34, 38. Although Davila expressed uncertainty about the frequency of Father's visits with Child, when pressed by the court, she suggested that Child saw Father twice a year prior

_____

[5] Further, the court rejected CYF's argument that Father's efforts should not be considered because they took place following the initial filing of the petitions in October 2017, instead utilizing September 6, 2018 as the date Father was served with the amended petitions. *See* Orphans' Court Opinion, 4/10/19, at 13.

to 2018, based on her conversations with Child's maternal grandmother. *See id.* at 53.

Davila testified that Father calls Child weekly, and also writes emails to Child. *See id.* at 36. Davila transports Child to visits monthly and noted the "visits go very well. [Child] likes to go and see dad." *See id.* at 34. The visits last between one and two hours and had been occurring for six months. *See id.* at 35-36. Davila described the visits as follows:

> There is a lot of conversation. I think I see[] how during visits and through the months their relationship ha[s] grown like asking good questions. Father will ask good questions, talk about sports and what is going on with [Child]. He seems to be very interested in what is going on with him to the point that if [Child] is angry for whatever reason he'll ask why. I think there is a good quality time that happens when the visit occurs and [Child] seems to be really happy to see his dad, both of them.

*See id.* at 36. When Father asked Child what Child viewed him as, Child responded "dad." *See id.* at 54. Child also expressed that he wished to continue seeing Father and is unhappy with the prospect of not seeing Father. *See id.* at 50, 54.

Further, Davila noted that Child is 13, in seventh grade, and "is not doing that great." *See id.* at 38. Child refuses to do school work and vandalized the school. *See id.* Davila noted that Child is in a specialized foster home and that his relationship with his foster parents, who are not currently adoptive resources, is strained. *See id.* at 41-43. In addition to other health issues, Child is diagnosed with ADHD. *See id.* at 39. Child was also hospitalized in December 2018 due to self-harming behavior. *See id.* Davila

opined that it is in Child's best interests to terminate Father's parental rights because Father is not consistently there for Child. ***See id.*** at 43.

Father testified that he saw Child regularly before he was incarcerated, describing their relationship as "great." ***See id.*** at 66-67. Father further testified he maintained contact with Child after he was imprisoned. ***See id.*** at 67-68. Father sees Child once per month and looks forward to the visits, as does Child. ***See id.*** at 71. Father and Child discuss sports, and things that are bothering Child. ***See id.*** Father testified that both he and Child hope the visits continue. ***See id.*** at 72. Father speaks with Child on the phone three times a week or more. ***See id.*** Additionally, Father writes emails to Child, and, although Child does not always respond, Child indicates has read the emails when they speak on the phone. ***See id.*** at 73. Father testified that he would continue to stay in touch with Child if his parental rights are not terminated. ***See id.*** at 77.

Initially, we reject CYF's argument that the court improperly considered Father's visits with Child that occurred after CYF filed its termination petitions in October 2017. CYF withdrew the petitions in December 2017, before filing amended petitions in August 2018. The court appropriately disregarded CYF's initial petitions because, where an amended petition is filed, the original petition is superseded and rendered a virtual nullity. ***Brooks v. B & R Touring Co.,*** 939 A.2d 398, 402 (Pa. Super. 2007) (amended complaint, once filed, becomes operative pleading). Moreover, the limitation provided in Section

2511(b) only applies to efforts that "are first initiated subsequent to the giving of notice of the filing of the petition." **See** 23 Pa.C.S.A. § 2511(b). Here, the credited evidence established that Father and Child visited several times per year long before CYF sought to terminate Father's parental rights. Accordingly, the orphans' court appropriately considered the entire history of Father's relationship with Child.

Further, although the relationship between Child and Father is atypical, after a careful review of the record, we find that the orphans' court's findings have sufficient support in the certified record and that the court did not commit an error of law or abuse of discretion in its determination that termination of Father's parental rights was not in Child's best interests pursuant to Section 2511(b). Accordingly, we affirm the orphans' court's decree.[6]

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/11/19

---

[6] Because we conclude that the orphans' court appropriately denied CYF's petition to involuntarily terminate Father's parental rights to Child, we do not reach CYF's last issue, wherein CYF argues that, to the extent Father's parental rights are involuntarily terminated, Mother's should be as well.