J-S42002-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.M.F., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.M-C., FATHER | : : : : : : : : | |
| | : | No. 1077 MDA 2024 |

Appeal from the Order Entered June 26, 2024
In the Court of Common Pleas of Adams County Orphans' Court at No(s):
RT-8-2024

BEFORE:  LAZARUS, P.J., BECK, J., and BENDER, P.J.E.

JUDGMENT ORDER BY P.J. LAZARUS:          **FILED: FEBRUARY 25, 2025**

A.M-C. (Father) appeals from the order, entered in the Court of Common Pleas of Adams County, Orphans' Court Division, terminating his parental rights to his daughter, A.M.F. (Child) (born April 2018), pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (5), (8), (10) and (b) of the Adoption Act.[1]  We affirm.

This case came to the attention of Adams County Children and Youth Services (Agency) as a result of concerns that Child was the victim of abuse and sex trafficking.  Child was adjudicated dependent on January 3, 2023. On April 4, 2024, a permanency review hearing was held, at which time Child remained in Agency custody for foster care placement.  After the hearing, the court determined that aggravated circumstances existed as to both Father and

---

[1] 23 Pa.C.S.A. §§ 2101-2938.

K.F. (Mother). Due to a finding of abuse, the Agency was excused from further efforts to reunify the family.

For the detailed factual history of this case, we refer the parties to this Court's memorandum decision in Mother's related appeal, *see In the Interest of A.M.F.*, *a Minor*, *Appeal of K.F.*, *Mother*, 1054 MDA 2024 (Pa. Super. filed February 13, 2025) (unpublished memorandum decision). Suffice it to say that Child was a victim of abuse at the hands of Father and Mother, as defined by 23 Pa.C.S.A. § 6303(b.1)(4) of the Child Protective Services Law (CPSL) (causing sexual abuse or exploitation of child through any act or failure to act).[2] On September 24, 2024, a panel of this Court affirmed the February 20, 2024 order. *See In the Interest of: A.M.F.*, *a Minor*, *Appeal of: A.M.-C., Father*, 377 MDA 2024 (Pa. Super. filed Sept. 24, 2024) (unpublished memorandum decision); *In the Interest of: A.M.F.*, *a Minor*, *Appeal of: K.F.*, *Mother*, 413 MDA 2024 (Pa. Super. filed Sept. 24, 2024) (unpublished memorandum decision).

Father raises three issues on appeal:

---

[2] Section 6303(b.1)(4) of the CPSL provides:

> (b.1) Child abuse.--The term "child abuse" shall mean intentionally, knowingly or recklessly doing any of the following:
>
> * * *
>
>  (4) Causing sexual abuse or exploitation of a child through any act or failure to act.

23 Pa.C.S.A. § 6303(b.1)(4).

1. The trial court abused its discretion and/or erred as a matter of law when the Agency failed to prove by clear and convincing evidence that []Father's parental rights should be terminated.

2. The trial court erred as a matter of law or abused its discretion in terminating []Father's parental rights when Appellant/Father had completed each of the directives and goals demanded by the Agency to effectuate reunification.

3. The trial court erred as matter of law or abused its discretion when it determined in the absence of clear and convincing evidence that []Father's bond with the child, "while growing, is one similar to an acquaintance."

Appellant's Brief, at 2.

After an exhaustive review of the record, the briefs, and the arguments in this matter, and mindful of our standard of review, we affirm the order terminating Father's parental rights, and we rely on the opinions and findings of fact and legal conclusions authored by the Honorable Michael A. George. **See** Findings of Fact/Conclusions of Law, 6/25/24 (Agency proved by clear and convincing evidence that termination of Father's parental rights warranted under 23 Pa.C.S.A. §§ 2511(a)(2), (5), (8), (10) and (b)); Pa.R.A.P. 1925(a) Opinion in Abuse Proceeding, 4/8/24 (setting forth factual and procedural history); Pa.R.A.P. 1925(a) Opinion in Termination Matter, 8/21/24, at 3-4 (court finding Child's bond with Father is "minimal" at best and Father's disagreement with characterization of that bond as "acquaintance" challenges court's credibility determination). The parties are directed to attach a copy of these opinions in the event of further proceedings.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: <u>02/25/2025</u>

IN THE COURT OF COMMON PLEAS OF ADAMS COUNTY, PENNSYLVANIA
ORPHANS COURT

**IN THE INTEREST OF:**

**A.M.F.**                                                    **RT-8-2024 (A)**
                                                             **1077 MDA 2024**

### OPINION PURSUANT TO Pa. R.A.P. 1925(a)

Appellant, the natural father of A.M.F. ("Child"), challenges this Court's termination of his parental rights. Appellant claims trial court error in finding clear and convincing evidence supporting the termination of his rights. He argues that he has achieved the objectives set forth in the permanency plan for reunification. Appellant also challenges this Court's factual finding that his bond with the Child is "one similar to an acquaintance." For the reasons set forth below, it is respectfully requested that the trial court's decision terminating Appellant's parental rights be affirmed.

The factual history is extensively set forth in this Court's 1925(a) Opinion filed with the Superior Court at 377 MDA 2024 (appeal challenging this Court's finding Appellant as a perpetrator of abuse), a copy of which is attached hereto. That factual history is supplemented by this Court's Findings of Fact dated June 25, 2024.

The gist of Appellant's argument is his claim that he has complied with all objectives established by the Court in furtherance of reunification and, therefore, he should be reunified with the Child. This argument, rather than being a basis for relief, actually confirms this Court's concern supporting the conclusion that termination of Appellant's parental rights is in the best interest of the Child. More specifically, Appellant's mechanical application of his compliance with objectives without

recognition of the significant trauma suffered by the Child, and the Child's needs, remains a major impediment to successful reunification.

Instantly, the Child was removed from the custody of her parents due to allegations of sexual abuse. Almost immediately following her removal, the emotional health of the Child became a primary concern as she exhibited significant symptoms of trauma including inappropriate sexualized behavior, severe hypervigilance, and regular digression into a dissociative state. Concurrent with efforts to address the Child's trauma, significant services were put in place for Appellant. Although he was compliant with those services, Appellant never fully recognized the severity of the Child's issues nor has the Child's emotional well-being stabilized during his continued contact with her. Importantly, there appears to be no other services reasonably available to minimize the trauma other than termination.

Appellant's parental rights were terminated, *inter alia*, pursuant to 23 Pa. C.S.A. § 2511(a)(8).[1] The Superior Court has very recently described the burden on a petitioner in seeking to terminate parental rights pursuant to Section 2511(a)(8) as follows:

> To meet its Section 2511(a)(8) burden, [the petitioner] was required to establish three elements: (1) that the child has been removed from the care of the parent for at least twelve months; (2) that the conditions which led to the removal or placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child. *Int. of M.E.*, 283 A.3d 820, 832 (Pa. Super. 2022) (citation omitted). This subsection "does not require the court to evaluate a parent's willingness or ability to remedy the conditions that led to the placement of the children." *Id.* (citation omitted). Rather, "the relevant inquiry regarding the second prong of § 2511(a)(8) is whether the

---

[1] The Court also found clear and convincing evidence to terminate Appellant's parental rights pursuant to 25 Pa. C.S.A. 2511(a)(2), (5), and (10). Appellate authority is well settled that the reviewing court "need only agree with the [trial] court as to any one subsection of [§] 2511(a), in addition to [§] 2511(b), to affirm." *In Re Adoption of B.G.S.*, 245 A.3d 700, 705 (Pa. Super. 2021).

2

conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *Id.* (cleaned up).

*In Re L.C.J.W.*, 311 A.3d 41, 49 (Pa. Super. 2024).

Although it is true that Appellant has generally complied with objectives established by the Court, the process has been ongoing for approximately 18 months, yet the Child remains fearful of Appellant and exhibits physical manifestations of trauma in temporal proximity to interactions with Appellant. Numerous unrelated sources have presented credible testimony concerning the emotional behavior problems induced by trauma associated with the Child's relationship to Appellant. Multiple therapists have identified the toxic nature of the Child's historical relationship with Appellant. Credible and consistent evidence establishes that the trauma triggered emotional harm suffered by the Child may take significant time, if ever, to heal.

Against this backdrop is the healthy relationship the Child has developed with her foster parents. Unquestionably, a significant bond has been established between the foster parents and the Child. Importantly, that bond carries over to other family members in the foster parents' household. The Child turns to the foster parents for emotional support and safety and affectionately refers to them as "mom" and "dad."

On the other hand, Appellant's relationship with the Child has resulted in, at best, a minimal bond. Descriptions of the visits between Appellant and Child are consistent with those which the Child may share with other acquaintances. Hearing evidence revealed that sometimes the Child likes to visit with Appellant while on other occasions she does not wish to do so. Conversation between Appellant and Child as

3

evidenced by videos of the visits centers on food items and play while meaningful conversation about the Child's well-being either does not occur or is shut down by the Child once the subject is approached. When the Child is not on an actual visit with the Appellant, she does not speak about him unless a trauma response is triggered. Without prompting, the Child refers to her foster parents as "mom" and "dad" and to her natural parents by their first names.

Appellant takes issue with this Court's description of the Child's bond with him as "acquaintance." This challenge is no more than a challenge to the credibility findings of the Court as the overwhelming testimony of witnesses, including caseworkers and supervisors from Adams County Children and Youth Services, supports the Court's finding.[2] Although Appellant understandably disagrees with this Court's semantics, it is the province of the Court to assess credibility and resolve conflicts in evidence and, in doing so, "is free to believe all, part, or none of the evidence presented." *In Re M.G. and J.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted). Moreover, the Court's description of Appellant's bond with the Child, in and of itself, is not a basis for relief. The important determination, which is overwhelmingly supported by the evidence, is that the foster family's bond, rather than Appellant's, is the primary emotional support for the Child. *See In Re K.M.*, 53 A.3d 781 (Pa. Super. 2012) (the child's primary emotional attachment is a significant factor in evaluating the child's developmental and emotional needs and welfare).

---

[2] In deciding whether to order the termination of parental rights, the Court is free to rely upon the assessments of social workers and caseworkers. *In Re Adoption of J.N.M.*, 177 A.3d 937 (Pa. Super. 2018), appeal denied 183 A.3d 979, 646 Pa. 149.

4

For the foregoing reasons, it is respectfully requested that the appeal in this matter be dismissed and the trial court's Order affirmed.

BY THE COURT:

_____
**MICHAEL A. GEORGE**
**President Judge**

Date filed: August 21, 2024

IN THE COURT OF COMMON PLEAS OF ADAMS COUNTY, PENNSYLVANIA
ORPHANS COURT

**IN THE INTEREST OF:**

**A.M.F.**

**DP-59-2022**
**377 MDA 2024**

2024 APR -8 PH 3:37
CLERK OF COURTS
FILED

## OPINION PURSUANT TO Pa. R.A.P. 1925(a)

In this Children's Fast Track Appeal, Appellant, the natural father ("Father") of

A.M.F. ("Child"), challenges this Court's evidentiary admission of statements made by

the Child under the tender years exception, 42 Pa. C.S.A. § 5985.1, and subsequent

finding that Appellant was a perpetrator of abuse as defined by 23 Pa. C.S.A. §

6303(b.1)(1).[1] Because resolution of Appellant's claims is largely factually driven, the

factual findings made by this Court will be thoroughly set forth below.

In July 2022, the Adams County Children and Youth Agency ("Agency")

received a child protective services ("CPS") referral regarding the Child due to

allegations of sexual abuse by an alleged perpetrator identified as the natural

mother's ("Mother") paramour, G.W. The Child was subsequently interviewed at the

Adams County Children's Advocacy Center ("CAC") wherein she disclosed claims of

being touched by an individual who "speaks Spanish." The Child, who was four

years old at the time, did not provide any further description of the incident nor further

---

[1] Although Appellant's Concise Statement of Matters Complained of on Appeal itemizes six separate challenges, they all generally raise the two primary issues identified above with the exception of a challenge based upon this Court's alleged preclusion of inquiry concerning inconsistent statements made by the Child. The vagueness of this separate challenge denies this Court the opportunity to meaningfully respond to the same. The record generally reflects that counsel was permitted wide latitude in presenting and cross-examining testimony. Without specific reference to a specific ruling made by this Court in an otherwise voluminous record, this Court is deprived of the ability to intelligently and meaningfully address the issue. Accordingly, the issue is waived. Pa. R.A.P. 1925(b)(4); *see also* **Commonwealth v. Dowling**, 778 A.2d 683, 686-87 (Pa. Super. 2001) ("[A]

identification of the alleged perpetrator. Additionally, G.W. was interviewed by law enforcement entities and denied any inappropriate behavior. The Agency subsequently made a finding that the report was unfounded based upon insufficient evidence.

Concurrently with the CAC interview, a temporary emergency protection from abuse order was obtained which prohibited G.W. from having any contact with the Child. At a subsequent final hearing on the protection from abuse petition, the Honorable Judge Shawn Wagner concluded that the Child was not competent to testify and, consequently, there was no evidence to support the entry of a final protection order.

On December 4, 2022, Mother obtained custody of the Child after the Child had spent the weekend with Appellant at his house. At some point thereafter, Mother noticed genital bruising on the Child. When she attempted to ask the Child how she got the bruise, no disclosures by the Child were made. Nevertheless, on December 6, 2022, Mother took the Child to UPMC Hanover Hospital. At the hospital, the Child underwent a medical-forensic examination by the forensic nursing department. The Child reported to the forensic R.N. that "Papa poked me with a stick." The Child further clarified that "Papa" is her father. When asked by the R.N. to clarify where Father poked her, the Child pointed at her genital area claiming, "he poked me and it hurt." When asked what kind of stick Father poked her with, the Child stated, "his stick down there on him" and pointed to her genital area.

---

Concise Statement which is too vague to allow the court to identify the issues raised on appeal is the functional equivalent of no Concise Statement at all.").

Mother subsequently entered into a protective plan with the Agency. The plan, however, was unsuccessful as Father sought, and received, law enforcement assistance in obtaining custody of the Child pursuant to the terms of an existing custody order. At the time Father obtained custody, the Child was present with Mother and G.W. despite a provision in the custody order prohibiting G.W. from having contact with the Child.

On December 15, 2022, a referral was received by the Agency alleging sexual abuse of the Child by G.W. Additionally, Father filed a protection from abuse petition seeking to prohibit contact between Mother and the Child. Due to the ongoing CPS investigations against Father, Mother, and Mother's paramour, a family plan was entered into placing custody of the Child in a kinship setting with a friend of Father's who was familiar with the Child. The following day, the Agency discovered that Father's friend had returned custody of the Child to Father. On December 19, 2022, an application for protective custody was filed by the Agency and emergency protective custody was subsequently granted by the Court. The Child was placed in a kinship placement with her maternal grandfather.

At an adjudication hearing on January 3, 2023, the Court was advised that Mother had agreed to a second forensic interview of the Child at CAC; however, Father was not in agreement with the interview. Following the hearing, the Child was adjudicated dependent. Additionally, the Court modified the Child's placement amid concerns of undue influence over the Child on the part of Father's family concerning the various CPS referrals. The Child was placed in foster care with D. and A F

3

On January 11, 2023, the Agency received a letter from the CAC's trauma therapist Amanda Evans-Freet. Ms. Evans-Freet indicated the symptoms and behaviors exhibited by the Child suggested "a history of being verbally coached by adult(s), inappropriate sexualized exposure(s) and a history of residing in an unsafe environment(s) with an unsafe adult(s)." Ms. Evans-Freet recommended that all contact with biological Mother and biological Father cease until the Child stabilized. On January 13, 2023, the Agency filed a Motion to Suspend Contact between the Child and her natural parents.

Following a hearing held on January 17, 2023, the motion was denied, however, the Court directed the supervised visits with the parents to be digitally recorded.[2] The Court further acknowledged the Agency could renew their motion should continued concerns arise.

On January 20, 2023, the Agency filed a second request to suspend contact between the Child and her natural parents. A hearing was held on January 27, 2023. At the hearing, Ms. Evans-Freet presented credible testimony that, based upon her two interviews with the Child, continued visits with either of the natural parents would present a threat of harm to the Child's emotional health. Ms. Evans-Freet also offered her observations of the video-recorded visits between the Child and her parents. She opined that her review of the videos confirmed her belief that continued contact with the parents was emotionally damaging to the Child's health. The Court's independent review of the video-recorded visits corroborated Ms. Evans-Freet's opinion as the Child was disinhibited with Mother and exhibited troubling behavior

---

[2] Ms. Evans-Freet did not testify at the hearing.

during her interaction with Father. Specifically, the Court observed in the video a number of the trauma triggers referenced by Ms. Evans-Freet in her testimony. Additionally, the Agency caseworker indicated that Father had three supervised visits with the Child. The caseworker further indicated that prior to the visits, the foster family reported that the Child had significant emotional digression including episodes of the Child crying and screaming, "I am scared of Poppy." During the visits, Father spoke to the Child in Spanish, which raised concern with the caseworker in regard to Father "coaching" the Child. During one visit, the caseworker observed the Child say to Father, "You hit me" to which Father responded, "You hit me first." The foster mother reported the Child "clinged" to her prior to the visits. Additionally, it was reported that the Agency had conducted a family meeting which Father did not attend. At the conclusion of the hearing, the Agency's request to stay visitation with both parents was granted until the next permanency review hearing scheduled for February 21, 2023.

At the permanency review hearing on February 21, 2023, Ms. Evans-Freet credibly discussed the trauma symptoms displayed by the Child, including severe hypervigilance, sexualized behavior, avoidance, struggling with physical borders, and a generalized fearfulness. According to Ms. Evans-Freet, the Child indicated to her that she is afraid of "strangers inserting things in her butt." The Child further claimed she does not want to see Father as she is afraid of him but "can't talk about it." Ms. Evans-Freet further indicated the totality of her interactions with the Child had raised concerns over the Child being "sex-trafficked." Ms. Evans-Freet renewed her

concerns that contact with Mother would cause the Child to regress in her therapeutic progress.

Foster mother A⌐    F⌐    , who is a registered nurse, also testified at the permanency review hearing. She indicated the Child is fearful of visits with Father. For instance, on her way to the permanency review hearing, the Child was afraid that "Poppy"[3] was going to be at the court hearing and she did not want "Poppy to touch her." Ms. F⌐    testified to other conversations with the Child that were similarly concerning.[4] She also revealed the Child has had multiple stool and urinary accidents which seem to be triggered by fear of Father. While at the foster home, and at preschool, Ms. F    indicated the Child gets angry and is physically aggressive having caused injury to other children. Based upon hearing testimony, the Court temporarily suspended visits between the Child and her parents.

At the permanency review hearing on May 2, 2023, Ms. Evans-Freet testified concerning numerous disclosures made by the Child. The disclosures consistently

---

[3] According to Ms. F    ⌐   , Poppy is a reference to Father.

[4] According to Ms. F⌐⌐  a⌐ , on the evening the Child was placed in her home, while putting the Child to bed, the Child inquired of her, "Do I sleep with Mr. D⌐⌐   ?" referring to foster father D⌐  κ F    . The Child further asked, "No man, come in here?" She claimed she was afraid of Mr. D⌐ ⌐κ and stated, "D⌐   don't put that up my booty." Finally, the Child inquired of Ms. F⌐     "Are strangers coming into my room?"

On January 5, 2023, the Child questioned Ms. F⌐     , "Who sleeps in this bed?" And while expressing fear, the Child asked, "Nobody come in here when I sleep?" She further asked, "I don't sleep in no bed or Grace's bed or Mr. D    s bed?" referencing the foster father and the foster family's natural children.

On January 6, 2023, the Child stated, "I don't want to see Mommy or Poppy, I scared of them." She further said, "When tears go in my mouth they make me sick, the tears make me throw up, I throw up on the man." The Child stated the name "Mario" and once again inquired whether strangers were coming into her bedroom.

On January 7, 2023, the Child made statements to Ms. F⌐     ⌐ that she doesn't "want that man to come in here, he's scary. His name is Joe Joe, he touched my privates."

On January 8, 2023, the Child stated to Ms. F⌐⌐  ⌐ , "Poppy hit my head and my body. Poppy doesn't take care of me. He does bad things to me." During the Child's placement at the F⌐⌐⌐⌐ , she consistently made additional statements about "strangers" touching her, claiming her "booty hurts", and referencing her fear of Father and her paternal grandmother.

6

referenced "strangers" coming into her bedroom and putting things in her butt. The Child indicated that strangers used to come to her mom's house and also put things up her butt. The Child repeatedly indicated that she is not allowed to talk about it and if she does, her dad and paternal grandmother "will kill you and get me." She talked about keeping the strangers happy by rubbing their bellies and making "their snakes happy." She distinguished her foster father by stating, "Daddy D_ doesn't put things in my butt and I don't have to sleep with him." According to Ms. Evans-Freet, her verbal statements were corroborated by the Child's nonverbals and physical symptoms. For instance, when the Child stated, "I got married once. When you get married, you have to get naked and the person you married is allowed to touch you" Ms. Evans-Freet observed the Child grabbing her genitals over her clothing. Similarly, the Child, in proximity to making disclosures, would grab her private area and run to the bathroom. Finally, Ms. Evans-Freet advised that the Child has regressed in her therapy and displayed psychosomatic symptoms following receipt of a birthday gift from Mother. At the conclusion of the permanency review hearing, and at the request of the F_ foster family, the Child was placed with C_ and R_ B_.

At a counseling session on April 4, 2023, the Child told Ms. Evans-Freet that her mom can't keep her safe from the "strangers." The Child further stated that her mom and G.W. drive her to the "stranger's house" where they "stick things in my butt."

7

Over the next several months, the Child made numerous regular and consistent statements to her foster mother, Ms. B_____. Generally, those statements fell into repetitive categories as follows:

1.      Her mom and G.W. hurt her and she does not want to return to them;
2.      Strangers put her in the car and give her candy;
3.      Strangers poke her vagina and it hurts;
4.      Her father is mean;
5.      Strangers go to her father's house and "stick things in my butt;"
6.      She is scared of her father;
7.      She will be killed if she tells; and
8.      References to having a boyfriend, being married, or receiving presents for sleeping with someone.

At numerous hearings throughout these proceedings, Ms. B_____b credibly testified to the psychosomatic reactions exhibited by the Child when speaking about Father or Mother or when in a public setting where males are present. Additionally, in the presence of Ms. B_____, the Child regularly engaged in sexualized behavior. Ms. B_____ observed that when the Child engages in discussions about Father, Mother, or strangers, she goes into a "dissociative" spell.

In August 2023, the Court attempted to resume visits with Father and Mother in a supervised setting. Ms. B_____ reported that following the visits, the Child dissociated and, on one occasion, laid on the floor for approximately one hour. Additionally, sexualized behaviors and further dissociation increased, her aggression returned, and her behavior deteriorated. Ms. B_____ described an instance where the Child began "humping" on a stranger when in public. Ms. Evans-Freet testified that she observed digression in the Child's emotional well-being during therapy sessions following reestablishment of parental visits. Ms. Evans-Freet, once again, observed evidence of coaching.

8

Initially, Appellant challenges this Court's finding that the Child's statements were admissible under the tender years exception. 42 Pa. C.S.A. § 5985.1 provides that an out-of-court statement made by a child victim who is under 16 years of age at the time the statement was made is admissible in evidence if the court finds "the evidence is relevant and that the time, content, and circumstances of the statement provides sufficient indicia of reliability" and further finds the child either testifies at the hearing or is unavailable as a witness. Appellant further challenges the Court's finding that the Child was unavailable as a witness as she did not testify at the various proceedings.

In considering this issue, it is important to distinguish statements made by the Child which are not hearsay or are otherwise admissible as an exception to the hearsay rules from those to which the tender years exception applies. For instance, present sense impressions, excited utterances, and then-existing mental, emotional, or physical conditions are exceptions to the rule against hearsay regardless of whether the declarant is available as a witness. Pa. R. Evid. 803. Statements concerning the Child's fears upon visiting with her parents or spontaneous statements about fear of strangers fall within this category. Similarly, the Child's claims of pain when uttered in the context of statements about Mother or Father are admissible as a hearsay exception. Nevertheless, the Child made several disclosures concerning past events which fall within a category of hearsay which is otherwise inadmissible absent a tender years exception.

The initial consideration in determining whether the tender years exception applied was whether the Child was available as a witness. In resolving this issue, the

9

Court conducted an in-camera interview and received testimony from numerous witnesses. The in-camera interview with the Child was unremarkable with the exception that the Child presented as pleasant and carefree. Notably, her demeanor was quite different than that observed during her video visit with Father during which she was emotionless and defensive. Efforts to focus the Child on substantive topics were unsuccessful.

At the hearings, the Court heard, and accepted as credible, the opinion of the Child's trauma therapist, Ms. Evans-Freet, who opined that requiring the Child to testify as a witness would result in her suffering serious emotional distress. This finding was corroborated by the testimony of the separate foster parents who, along with Ms. Evans-Freet, described the Child's digression into a dissociative state when speaking about her parents and "the strangers." Based upon the Court's observation of the Child, who was now five years old, the credible testimony of the Child's trauma therapist, and the physical dissociative traits exhibited by the Child by numerous witnesses when discussing the relevant subject, this Court found sufficient evidence as to the Child's unavailability to testify. The fact that Appellant disagrees with this Court's credibility assessment or factual findings is not a basis for appellate relief. *Commonwealth v. Snyder*, 870 A.2d 336, 350 (Pa. Super. 2005) ("[T]he trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence." (quoting *Commonwealth v. Hunzer*, 868 A.2d 498, 506 (Pa. Super. 2005))).

In determining whether the time, content, and circumstances of a statement provide sufficient indicia of reliability, a trial court should consider the spontaneity of

10

the statements, the consistency and repetition, the mental state of the declarant, the use of terms unexpected in children of that age, and the lack of motive to fabricate. *Commonwealth v. Strafford*, 194 A.3d 168, 173 (Pa. Super. 2018). Unquestionably, a review of the current record reflects not only the use of graphic sexual terminology and descriptions unexpected of a child of five years of age but also sexualized behavior by the Child well beyond the normal range of behavior of a child of similar age. All statements made by the Child were spontaneous in nature and lacking any prompting by interrogation or undue influence. The statements are consistent in subject matter and, importantly, were uttered to separate adults in separate settings. There is no indication of motive to fabricate or manipulate the situation on the part of the Child. Perhaps most persuasive is the consistent testimony of the statement recipients that the Child's representations were accompanied by psychosomatic physical manifestations including uncontrollable dissociation.

Finally, as mentioned above, the Agency presented the credible testimony of the Child's trauma therapist who opined that the statements were authentic as evidenced by the Child's demeanor, consistency, manner of speech, mimicking of behavior, and emotional disconnection. Once again, Appellant's different interpretation of evidence or disagreement of the Court's factual findings is not a basis for appellate relief. Unquestionably, the record in this matter supports the Court's finding that the statements are admissible under the tender years exception. *In re A.K.*, 936 A.2d 528, 533 (Pa. Super. 2007) (explaining trial courts do not abuse

11

their discretion "[w]hen the trial court's findings are supported by competent evidence of record").

Appellant next challenges the Court's finding of abuse perpetrated by Appellant. In dependency proceedings, the existence of child abuse must be proven by clear and convincing evidence. However, under certain circumstances, the identity of an abuser may be established by only prima facie evidence. *In re L.V.*, 127 A.3d 831, 837-38 (Pa. Super. 2015). "Child abuse" is defined by statute to mean the intentional, knowing, or reckless causing of, inter alia, "sexual abuse or exploitation of a child through any act or failure to act." 23 Pa. C.S. § 6303(b.1)(4). The evidence presented by the Agency following extensive hearing is not only sufficient to establish child abuse but also establishes the identity of the perpetrators by clear and convincing evidence.

Over the course of several months, the Child expressed fear of Father and Mother and consistent accounts of "strangers" putting "sticks" in her "butt" while in the custody of both Mother and Father. While under initial inspection one might question statements made by a five-year-old as fantasy, the statements gain significant credibility by their consistency, interrelationship, and the obvious trauma displayed by the young Child. As mentioned above, the statements were unprompted in various scenarios to at least four separate individuals. Moreover, the complexity of the interrelationship between the statements is much greater than one would expect from a five-year-old. For instance, relating marriage and gifts to having sex with a male "stranger" to a subsequent inquiry of a foster parent as to whether the Child is going to marry or receive gifts from the foster father establishes a clear nexus of credibility

based not merely on words but upon the Child's inquisitive application of those words as can only be learned through experience. Moreover, the Child did not simply recite allegations during the disclosures but exhibited extreme psychosomatic reactions, including significant dissociative behavior witnessed, once again, by several independent witnesses. It is unreasonable to suggest that a five-year-old is sufficiently skilled enough to "act" in such a convincing manner consistent with the "claims" unless, of course, the child is not "acting." The Child's statements are further corroborated by the testimony of Ms. Evans-Freet who credibly testified, based on her experience, that the Child has been subjected to significant coaching and child abuse. The totality of this evidence establishes by clear and convincing evidence that both Mother and Father were involved directly, and by omission, in the sexual exploitation of their Child who, unquestionably, is significantly traumatized.

For the foregoing reasons, it is respectfully requested that the trial Court's finding in this matter is not an abuse of discretion and that the appeal in this matter be denied.

BY THE COURT:

_____
**MICHAEL A. GEORGE**
**President Judge**

Date filed: April 8, 2024

13